## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:                                                           Case No.: 23-14082-SMG

LATASHA TRANSRINA KEBE,                        Chapter 11

      Debtor-in-Possession.

_____/

### THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION
### UNDER SUBCHAPTER V FOR LATASHA TRANSRINA KEBE

#### February 21, 2025

Latasha Transrina Kebe, the Debtor-In-Possession, by and through undersigned counsel, files this Third Amended Plan of Reorganization Under Sub Chapter V ("Plan") in accordance with the provisions of 11 U.S.C. §1191, in order to both provide Creditors entitled to vote on the proposed Plan with adequate information in order to make an informed vote upon the proposed Plan and the terms of the Plan.

DEBTOR:                                              ATTORNEY FOR DEBTOR:


By: /s/ Latasha Transrina Kebe                 By: /s/ Chad Van Horn, Esq
    Latasha Transrina Kebe                          Chad Van Horn, Esq.
                                                               Florida Bar No. 64500
                                                               Van Horn Law Group, P.A.
                                                               500 NE 4th Street, Suite 200
                                                               Fort Lauderdale, Florida 33301
                                                               (954) 765-3166
                                                               (954) 756-7103 (facsimile)
                                                               Email: Chad@cvhlawgroup.com


---

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one. You are encouraged to carefully review the full text of this document, including all exhibits and/or attachments, before deciding how to vote on the Plan.**

---

# TABLE OF CONTENTS

BACKGROUND.................................................................................................................. 4
   (a)   Debtor's Business. ......................................................................................... 4
INTRODUCTION ............................................................................................................ 10
ARTICLE I ....................................................................................................................... 10
  Definitions .................................................................................................................... 10
ARTICLE II ...................................................................................................................... 13
  Treatment of Claims and Equity Interests .................................................................... 13
     A.     Unclassified Claims. ........................................................................... 13
     B.     Classes of Secured Claims ................................................................. 15
     C.     Priority Unsecured Claims ................................................................. 16
     D.     General Unsecured Claims ..................................................................17
ARTICLE III ..................................................................................................................... 19
     A.     Designation of Impaired and not Impaired Classes...........................19
     B.     Voting of Claims and Equity Interests ...............................................19
ARTICLE IV ..................................................................................................................... 19
  Provisions Covering Distribution, General Provisions ................................................. 19
     A.     Method of Distribution Pursuant to the Type of Confirmed Plan ............20
     B.     Disputed Claims ..................................................................................23
     C.     Disallowed Claims ..............................................................................23
     D.     No Recourse ........................................................................................23
     E.     Amendments to Claims .......................................................................23
     F.     Post-Petition Interest on Claims .........................................................24
     G.     Non-Disparagement Clause…..………………………………………24
     H.     Unclaimed Distributions. ....................................................................25
ARTICLE V ...................................................................................................................... 25
  Executory Contracts and Unexpired Leases. ................................................................ 25
     A.     Assumption or Rejection of Executory Contracts and Unexpired Leases ................ 25
  Provisions for Execution and Implementation of the Plan ........................................... 26
     A.     General ................................................................................................26
     B.     Funding ...............................................................................................26
     C.     Effectiveness of Securities, Instruments and Agreements ..................26
     D.     Approval of Agreements .....................................................................26
     E.     No Change of Control .........................................................................26
     F.     Administration After the Effective Date .............................................26
     G.     Term of Bankruptcy Injunction or Stays ...........................................26
     H.     Re-vesting of Assets ...........................................................................27
     I.     Discharge of Debtor ...........................................................................27
     J.     Stay of Certain Conduct Related to Discharge...................................27
     K.     Votes Solicited in Good Faith ............................................................29
     L.     Legal Proceedings ..............................................................................29
ARTICLE VII.................................................................................................................... 30
     A.     Conditions Precedent to Confirmation ...............................................30
     B.     Effect of Failure .................................................................................31
     C.     Waiver of Conditions .........................................................................31
ARTICLE VIII .................................................................................................................. 31

ARTICLE IX ................................................................................................................ 32
    A.    Effectuating Documents and Further Transactions. ................................32
    B.    Post-Effective Date Fees and Expenses ................................................32
    C.    Amendment or Modification of Plan .....................................................33
    D.    Severability ............................................................................................33
    E.    Filing of Additional Documents .............................................................33
    F.    No Admissions .......................................................................................34
    G.    Substantial Consummation ....................................................................34
    H.    Inconsistency .........................................................................................34
    I.    Remedy of Defects ................................................................................34
ARTICLE X ................................................................................................................. 34

EXHIBIT "A" - Liquidation Analysis
EXHIBIT "B" - Projections

# BACKGROUND

## (a)    *Debtor's Business.*

<u>Social Media</u>

The Debtor, Latasha Kebe or "Tasha K," is a social media content creator. Debtor started her YouTube[1] channel in 2015 and within a few years significantly increased the number of followers interested in following her pop culture wine, gossip, and comedy series "UnWinewithTashaK." Debtor later created a second YouTube channel, "Winos Podcast" and expanded to other social media platforms including Meta (Facebook/Instagram/Threads), Twitter (now "X"), TikTok, and Rumble. Debtor currently publishes approximately 10 to 12 episodes per week across her channels.

Debtor earns income on these platforms if her account is "monetized." Social media monetization is a social media marketing strategy where income is generated from their audience on their social channels based on various metrics; each social media platform has different metrics in terms of calculating an influencer's income. For example, on YouTube, Debtor earns royalty revenue from viewers and also has the opportunity to earn "super chats," which are donations from subscribers when Debtor is livestreaming.[2] Debtor also earns commissions on third-party advertisements in which advertisers pay Debtor to promote their products on her social media in exchange for a commission. For example, Debtor receives 55% of the fees paid by the advertisers to Google and Meta. Debtor is paid both individually and through her husband Cheick Kebe's company Yelen Entertainment, LLC ("Yelen").[3] Income Debtor earns through Yelen is committed to support the Debtor's Plan by committing to fund amounts necessary to meet the Projections herein. Yelen's contributions are on account of, among other things, income Debtor earns from Yelen, other value attributed to Debtor by Yelen, and to assist and facilitate a consensual Plan that would resolve concerns of certain key constituencies (the "Yelen Contribution").

Debtor also earns income for the use of her name and likeness on a subscription based streaming media platform called "Tasha K Live." Income attributable to Debtor from Tasha K Live is deposited into the bank accounts of Yelen and is included in the Debtor's Projections herein.

<u>Tasha K On Stage Comedy Shows</u>

In March 2023, Debtor held her first live comedy show, Tasha K On Stage.[4] Since then Debtor has performed several other shows—the two  most recent in Orlando, FL[5] on July 14, 2024 and Boston, MA[6] on July 20, 2024; Debtor's income generated from Tasha K On Stage performances varies greatly because, depending on the venue and third-party contracts, Debtor may have to put down a deposit on the venue and then from the gross sales generated from the show,

---

[1] YouTube is owned by Google.

[2] YouTube takes approximately 30% of all super chats.

[3] Yelen is owned by Cheick Kebe and his brother Lassana Kebe, 50/50.

[4] Gross sales of $20,423.97 with a net profit of $17,177.90 (before paying third-parties and other necessary expenses).

[5] Net profit of $4,410.00

[6] Net profit of $4,700.00.

Debtor has to pay actors, hire security, book hotels and lodging for her team and actors, pay for meals, hire makeup artists, and/or pay for other necessary expenses.

Debtor intends on capitalizing on the opportunities Tasha K On Stage holds. Debtor has executed contracts and scheduled several shows over the course of 2024 and anticipates securing more contracts in the future. Debtor anticipates that she will be able to increase her ticket prices over time and earn more income from Tasha K On Stage. Income Debtor earns through the Tasha K On Stage comedy show is included in the Debtor's Projections herein.

<u>Management and Production of Debtor's Business and Content</u>

Debtor's business is managed by her husband Cheickna Kebe ("Cheick") and Yelen. Yelen's duties include management of Tasha K's social media websites; producing video content for placement on the internet or social media; repurposing old video content for placement on the internet or social media; video editing services; creation of promotional videos; organization and maintenance of Debtor's social media sites and presence; search engine optimization services related to Debtor's social media sites and presence; marketing and advertising of Debtor's content on social media; negotiating advertising agreements related to the creation, maintenance and management of Debtor or Debtor's content on social media; negotiating Debtor's appearance at events, including live events and any other services related to the creation, maintenance or management of Debtor or Debtor's content on social media; advise, aid, counsel and guide Debtor with respect to Debtor's social media activities; and promote and publicize Debtor and Debtor's content on social media.

Cheick and Yelen are integral to Debtor's business as well as her bankruptcy estate. To date, Debtor has not paid Cheick or Yelen a management fee for their services. The industry norm for management and production fees of Debtor's content could range from approximately 10% to 15% of gross revenues – less standard and customary deductions and exclusions. With Debtor publishing 10-12 episodes per week, the cost to Debtor and the estate to hire another management and production company would be outrageous.

In the Debtor's Projections (Exhibit "B"), the Debtor has included the Yelen Contribution.

**(b)** **The Defamation Action and Judgment**

In April 2018, Debtor aired the first of 23 videos in which Debtor made highly offensive, knowingly and provably false and defamatory negative statements about the song writer and performer Belcalis Marlenis Almánzar professionally known as "Cardi-B" ("Ms. Almánzar"). These videos were published on Debtor's YouTube channel and other social media platforms while Debtor was operating under her then-active limited liability company, Kebe Studios LLC.

On February 17, 2022, in the case of *Belcalis Marlenis Almánzar v. Latasha Transrina Kebe and Kebe Studios, LLC*, Case No. 1:19-cv-01301-WMR (N.D. Ga. 2022) ("Defamation Action"), the District Court for the Northern District of Georgia ("Georgia Court") entered a judgment for defamation, intentional infliction of emotional distress and false light ("Original Defamation Judgment") against Debtor and co-defendant Kebe Studios, LLC ("Kebe Studios").

On July 19, 2022, the Georgia Court amended the Original Defamation Judgment ("Amended Defamation Judgment").

Pursuant to the Amended Defamation Judgment, the Georgia Court entered judgment in the following amounts:

- $1,025,000.00 for pain and suffering and/or reputation injury and for medical expenses against both defendants;
- $1,000,000.00 in punitive damages against Debtor;
- $500,000.00 in punitive damages against Kebe Studios; and
- $1,338,753.47 for litigation expenses against both Debtor and Kebe Studios.

Ms. Almánzar is a creditor of Debtor as a result of the Amended Defamation Judgment entered in her favor and against Debtor and Kebe Studios. *See* Proof of Claim 5-1 for $3,911,680.95.

<u>Debtor's Domestic and Offshore Trusts and Business Entities</u>

Debtor contends that the impending entry of the Defamation Judgment against Debtor and Kebe Studios caused Debtor to panic and make hasty decisions that she felt were necessary to protect her family and her children but that Ms. Almánzar contends was in violation of Judge Wray's order and admonition to the Debtor in January of 2021 that she not move, sell or otherwise encumber any of her or Kebe Studios' assets. In March 2021, Debtor retained a Georgia attorney for an estate planning package for her and Cheick. This package included the creation of the following entities and domestic trusts:

- The Bamako Trust (Kebe Children Irrevocable Living Trust);
- Transrina Management Trust;
- Florida Joint Revocable Living Trust; and
- Tantou Family Limited Partnership (Georgia LP)

Because the litigation with Ms. Almánzar was still ongoing, each trust was funded with only $10.00 cash on hand; no bank account was ever created for any of the domestic trusts and nothing has been transferred into or out of any of the trusts to date. The limited partnership was likewise created but valued at $0.00 and never used by Debtor, Cheick, their family or any other individual or entity. The domestic trusts and limited partnership remain active today but have no value. Debtor intends to dissolve Tantou Family Limited Partnership to avoid the unnecessary cost of taxes and annual fees.

After the Amended Defamation Judgment was entered against Debtor and Kebe Studios, Debtor tried protecting her family assets and business assets, and in March 2022, found a random company online that advertised it specialized in asset protection through offshore trusts and business entities. This company convinced Debtor that it could protect her assets in ways that the domestic trusts that she and Cheick created in 2021 could not. Debtor, however misguided, hired this company to create an offshore trust and limited liability company–she used $25,000.00 from her husband's company, Carolyn Homes LLC, to fund the purchase and creation of the following:

- The Sambakessi Investment Trust (Cook Islands); and
- Soninkes LLC (Island of Nevis)

Neither the Sambakessi Investment Trust or the Soninkes LLC have ever been nor will ever be utilized by Debtor, Cheick, their family or any other individual or entity. In March 2023, the government of the Island of Nevis placed Soninkes LLC into a default status as a result of the entity never being used and thus never being renewed and renewal fees never being paid and Soninkes LLC was involuntarily dissolved.[7]

The Sambakessi Investment Trust has never been funded and has been in a state of default since April 27, 2023. The trust will expire on its own on April 27, 2024, but the trust will not officially be terminated until the trustee formally resigns. Debtor has taken all necessary steps to request and expedite the termination of this empty trust.

### (c)     Events Leading to the Corporate Chapter 11 Filing

Ms. Almánzar removed the judgment to the State Court of Gwinnett County, Georgia at 22-GC-03159 and garnished Debtor's "employer", Google, LLC and Debtor's account at Chase Bank.  Approximately $9,304.81 was garnished from Google, LLC and $1,083.02 was garnished from Chase Bank and is held in the trust account of Ms. Almánzar's attorney, Daniel T. Seelos, pending distribution to Ms. Almánzar and a credit towards the Amended Default Judgment. The garnishment and continuing collection of the Amended Default Judgment caused Debtor to file in Chapter 11 on May 25, 2023.

### (d)     The Adversary Complaint

On August 8, 2023, Ms. Almánzar filed an adversary complaint (Adv. No. 23-01153-SMG) against the Debtor under section 523(a)(6) of the Code, which provides for non-dischargeability of any debt "for willful and malicious injury by the Debtor to another entity or to the property of another entity."   Pursuant to two orders entered in the adversary proceeding, one on October 6, 2023 (Adv. No. 23-01153-SMG, DE 11) and the second on January 3, 2024, (Adv. No. 23-01153-SMG, DE 24), Ms. Almánzar's proof of claim No. 5 for $3,911,680.95 was allowed and excepted from discharge.

### SUMMARY OF PLAN

The proposed Subchapter V Chapter 11 Plan proposes two classes:  Class 1 - a secured claim; and Class 2 – general unsecured claims.  In addition, there are two (2) priority tax claims.

Class 1 consists of the secured claim of Ally Bank for $52,709.54 (POC-4) for the purchase of a 2021 Chevrolet Silverado with payment of $1,071.42 per month for seven years, commencing in May 2021 and ending in 2028. Debtor adopts and reaffirms the loan and is current in monthly

---

[7] Debtor attempted to voluntarily dissolve Soninkes LLC, but, according to the company that created Soninkes LLC, it would have cost Debtor approximately $4,000.00 or $5,000.00 to voluntarily dissolve the corporation and obtain a certificate of dissolution. The Debtor believed such an expense was an unnecessary waste of estate assets and therefore allowed the corporation to be involuntarily dissolved.

payments. This class is unimpaired.

Class 2 consists of the general unsecured class of ten (10) claims totaling $3,980,075. This is an increase of $37,119.00 from the original Plan (DE 43) as the result of the IRS filing an amended claim (POC #2-7) on July 3, 2024.  The largest claim is the non-dischargeable Amended Default Judgment held by Ms. Almánzar, in the amount of $3,911,680.95 (which includes interest) (POC-5), representing 98.28% of the total class amount. The balance of the class consists of nine (9) claims totaling $68,395.00. Consistent with Bankruptcy Code section 1191(c)(2), the net disposable income of the Debtor as supplemented with the Yelen Contribution, after paying all expenses and other higher priority classes, will be paid to this class over five years. In addition, the $9,304.81 garnished from Google, LLC and the $1,083.02 garnished from Chase Bank and currently held in the trust account of Ms. Almánzar's attorney, Daniel T. Seelos, will be distributed to Ms. Almánzar on the Effective Date and shall constitute a credit towards the Amended Default Judgment. The Code provides that if the plan is not consensual and is confirmed under 1191(b) the distribution to the unsecured class, as required by section 1191(b), shall be fair and equitable and will be calculated as part of the total income received under the plan, which in total distributions shall not be less than the projected disposable income as required by 1191(c) and defined by 1191(d).

A review of the MOR history shows that from May 2023 through December 2024 the Debtor earned a total of $879,034.74 and spent $874,234.10 resulting in an average monthly net of $240.03 available for the plan. This is because the Debtor's Tasha K Live on Stage contracts differ from the Debtor's first few shows as these contracts are with agents rather than the venues; the payment structure is much different and will generate relatively low profits at first. Under these contracts, because Debtor is a "rookie" performer, the ticket prices are much less for the first year in an attempt to increase Debtor's exposure in the industry. Debtor anticipates that she will be able to increase her ticket prices over time and earn more income from Tasha K On Stage. Also, in March 2024, Debtor contends that YouTube, without notice, began deducting taxes from its distributions to debtor, so that Debtor's net check from YouTube was some 45% smaller than usual. To make up this shortfall, Debtor has begun producing more content than previously.  In spite of this average, Debtor is proposing a "step up" Plan for a total payment to $1,198,934.00 to general unsecured creditor, or a 30.1% distribution over five years. Attached as Exhibit "B" are the Debtor's projections for income and expenses over the next five (5) years.  The Projections are determined by using Debtor's actuals, supplemented with the Yelen Contribution, and providing for increases each year in both income and expenses.

A total of $1,198,934.00 will be paid as follows:

| MONTHLY PAYMENTS | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Internal Revenue Service -Taxes | 2,000.00 | 2,000.00 | 5,142.12 | 5,142.12 | 0.00 |
| State of Georgia - Taxes | 500.00 | 500.00 | 1,887.88 | 1,887.88 | 0.00 |
| Ally Financial - Vehicle | 1,071.42 | 1,071.42 | 1,071.42 | 1,071.42 | 1,071.42 |
| Van Horn Law Group - Attorney Fees | 4,312.00 | 4,312.00 | 0.00 | 0.00 | 0.00 |

| | | | | | |
|---|---|---|---|---|---|
| General Unsecured Creditors - Monthly | 14,969.00 | 18,635.00 | 19,186.00 | 20,103.00 | 27,019.00 |
| **TOTAL OF PAYMENTS** | | | | | |
| General Unsecured Creditors - Quarterly | 44,905.50 | 55,905.50 | 57,557.50 | 60,307.50 | 81,057.50 |
| General Unsecured Creditors - Yearly | 179,622.00 | 223,622.00 | 230,230.00 | 241,230.00 | 324,230.00 |
| Cardi B - 98.28% of General Unsecured Class | 176,532.50 | 219,775.70 | 226,270.04 | 237,080.84 | 318,653.24 |

The total payment to the unsecured class equals a total distribution of 30.1% of allowed claims. This class is impaired. The bar date for claims was August 3, 2023. In an attempt to keep the monthly plan payments stepping up consistent with projections for Debtor's income as well as the Yelen Contribution, while paying the administrative fee of Debtor's counsel over a short period of time, the payment scheme for the unsecured creditors has been modified from the original plan by including annual increases in distributions over the 5-year term of the Plan.

The Plan also pays two priority tax claims: an IRS amended claim for 2021 income taxes in the amount of $121,772.00 (POC #2-7) filed on July 3, 2024, and Georgia income taxes in the amount of $39,452.00 for 2020 and 2021 (POC #6) within the time period required by the Code (i.e., 60 months from the filing of the Chapter 11 petition).  Assuming 40 months are left in the repayment period, compared to 55 months in the original plan, the monthly payment to the Georgia Department of Revenue, including interest at 4%, is now $1,055.15, increased from $786.70. Because of the reduced payback period the Debtor is proposing step up plan payments of $500.00 for year 1 and 2 (first 24 months) and $1,887.88 for the next 16 months.  The Georgia claim also includes a general unsecured portion for $5,801.10. This is being paid as part of Class 2, with a distribution of 30.1%.

The IRS tax claim as amended (POC #2-7) is for 2021 1040 taxes in the amount of $164,443.35, with $121,772.86 being the priority claim, and $42,670.49 as an unsecured claim. This is a substantial increase from the original claim (POC #2-1) totaling $97,715.81, which was treated in the original plan. Assuming 40 months left in the payback period, the monthly IRS payments has been increased from $1,674.09 to $3,256.85. Because of the reduced payback period and increased priority claim, the monthly payment to the IRS has increased to $3,256.85. The Debtor is proposing step up plan payments of $2,000.00 for year 1 and 2 (first 24 months) and $5,142.12 for the next 16 months. The unsecured portion of the IRS claim of $42,670.49 will be paid as part of Class 2.  To the extent that the IRS files an amended claim, the monthly payments will be amended accordingly to be compliant with the payback period set forth in the bankruptcy code.

Attached as Exhibit "A", as required by section 1190 of the Code, is a Liquidation Analysis which shows a $-0- distribution to unsecured creditors upon liquidation. This is less than the unsecured claims are scheduled to receive from the Plan distribution. The allowed unsecured creditors, totaling $3,980,075.03 will receive $1,198,934.00, which equals a dividend of 30.1% of their claims to be paid in twenty (20) quarterly payments (see above as to varying amounts).

## INTRODUCTION

The Debtor-in-Possession, Latasha Transrina Kebe, as a small business debtor, proposes this Chapter 11 Plan of Reorganization (as defined more fully below, the "Plan") pursuant to Subchapter V, 11 U.S.C. §1190 of the United States Bankruptcy Code ("Bankruptcy Code").

Reference is made to, among other things, a brief history of the Debtor, including the major events of this Chapter 11 Case, treatment of Claims against and interests in the Debtor, risk factors, liquidation analysis, tax implications, alternatives to the Plan, a summary and analysis of this Plan, projections with respect to the ability of the debtor to make payments of Disposable Income under the proposed plan and certain related matters.

**All Holders of Claims against and Equity Interests in the Debtor entitled to vote on the Plan are encouraged to read the Plan before voting to accept or reject the Plan. Your rights may be affected. You should read these papers carefully and discuss them with your attorney. (If you do not have an attorney, you may wish to consult one).**

Subject to certain restrictions and requirements set forth in 11 U.S.C. §1193, Bankruptcy Rule 3018, and in this Plan, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date (as defined below).

## ARTICLE I

*Definitions*

The definitions and rules of construction set forth in sections 101 (as amended by Subchapter V) and 102 of the Bankruptcy Code shall apply when those terms are used in this Plan, supplemented by the following definitions:

 **"Administrative Expense"** means any cost or expense of administration of the Chapter 11 Case entitled to priority under section 507(a)(2) of the Bankruptcy Code and allowed under section 503(b) of the Bankruptcy Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor, allowances of compensation or reimbursement of expenses to Professionals and the Subchapter V Trustee, to the extent allowed by the Bankruptcy Code.

"**Allowed Claim(s)**" means any Claim or interest that is allowed (other than as determined by a final non-appealable order of this Court and includes (i) a proof of claim to which no objection has been filed; and (ii) a Claim listed by the Debtor that has not been designated as contingent, disputed or unliquidated.

"**Amended Default Judgment**" means the judgment entered on July 19, 2022, in the Defamation Action.

**"Bankruptcy Code"** means title 11 of the United States Code (11 U.S.C. §§ 101-1330), the federal bankruptcy law.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, having jurisdiction over the Chapter 11 Case.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under Section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Case.

"**Business Day**" shall mean a day other than a Saturday, a Sunday, or a day on which commercial banks in Miami, Florida are authorized or required to close.

"**Claim(s)**" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; and/or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"**Class**" means a group of Claims classified together pursuant to the Plan.

"**Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order.

"**Confirmation Date**" shall mean the date upon which the Order confirming the Plan is entered by the Court in accordance with the provisions of Chapter 11, as amended by Subchapter V of the Code.

"**Confirmation Order**" shall mean an Order entered by the Bankruptcy Court, District Court, or other appellate Court confirming this Plan.

"**Consummation Date**" shall mean the date on which the Confirmation Order becomes a Final Order.

"**Debtor**" means the debtor in possession in this Chapter 11 Case, Latasha Transrina Kebe.

"**Defamation Action**" means the case of *Belcalis Marlenis Almánzar v. Latasha Transrina Kebe and Kebe Studios, LLC*, Case No. 1:19-cv-01301-WMR (N.D. Ga. 2022).

"**Disposable Income**" shall mean income that is received by the Debtor and that is not reasonably necessary to be expended for domestic support obligations, for maintenance or support of the Debtor and dependent, and for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtor.

"**Disputed Claim(s)**" means any Claim that has not been allowed or disallowed [by a final non-appealable order], and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent or unliquidated.

"**Distribution(s)**" shall mean funds to be paid to holders of Allowed Claims under the terms of this Plan.

"**Distribution Date**" shall mean the date upon which Distributions may be made pursuant to this Plan.

"**Estate**" means the estate created for the debtor in possession in her Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

"**Effective Date**" shall be the thirtieth (30th) day following the date upon which the Order is entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

"**Final Order**" shall mean an order or a judgment of the Court which has not been stayed and as to which order or judgment (or any revisions, modification or amendment thereof) the time to appeal or seek review or rehearing has expired.

"**General Unsecured Claim(s)**" means a Claim which is not a Secured Claim, a Priority Claim, Priority Tax Claim or any other claim entitled to priority under the Bankruptcy Code.

"**Impaired Claim**" shall mean any class of creditors whose claims are impaired by payments as proposed in this Plan, in accordance with 11 U.S.C. §1124.

"**Petition Date**" means May 25, 2023, the date on which the Debtor commenced this case by filing a voluntary petition under Subchapter V of Chapter 11 of the Bankruptcy Code.

"**Pre-petition**" means prior to the Petition Date.

"**Plan**" shall mean this Third Amended Chapter 11, Subchapter V Plan of Reorganization in its present form or as may hereafter be amended, modified or supplemented in accordance with the terms hereof or in accordance with the Bankruptcy Code.

"**Priority Claim and/or Priority Creditor**" shall mean any claim or holder of any claim, other than administrative expense or a tax claim, to the extent entitled to priority in payment under 11 U.S.C. §507(a).

"**Priority Tax Claim**" shall mean any claim to the extent entitled to priority in payment under 11 U.S.C. § 507(a)(8).

"**Reorganized Debtor**" means the Debtor, on or after the Effective Date.

"**Secured Claim or Secured Creditor**" means any Claim or the holder of any claim, that is secured pursuant to Section 506 of the Bankruptcy Code.

"**Subchapter V**" means Subchapter V of Chapter 11 of the Bankruptcy Code.

"**Subchapter V Trustee**" or "**Trustee**" means Maria Yip, the Subchapter V Trustee appointed in this case pursuant to section 1183 of the Bankruptcy Code.

"**Substantial Consummation**" shall mean that the Plan shall be deemed to be substantially consummated under sections 1101 and 1193(b) of the Bankruptcy Code.

"**Unimpaired Claim**" shall mean any class of creditors whose claims are not impaired under the Plan in accordance with 11 U.S.C. §1124.

"**Unsecured Claim and/or Unsecured Creditor**" shall mean any claim or the holder of any claim other than administrative expense claims, secured claims, priority claims, and tax claims.

**ARTICLE II**
*Treatment of Claims and Equity Interests*

This Third Amended Plan proposes to pay the Debtor's creditors pursuant to Section 1191 of the Bankruptcy Code. The treatment of and consideration to be received by holders of Allowed Claims or Allowed Interests pursuant to this Article and the Plan shall be in full satisfaction, settlement, release, extinguishment, and, as provided in 11 U.S.C. §1192 and 11 U.S.C. §1141(d), discharge of their respective Claims against or interests in the Debtor and the estate, except as otherwise provided in the Plan or the Confirmation Order. The holders of liens satisfied, discharged, and released under the Plan shall execute any and all documentation reasonably requested by the Debtor or the reorganized Debtor evidencing the satisfaction, discharge and release of such liens.

**A.**     **Unclassified Claims**

    **Allowed Administrative Claims**

Each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of such Allowed Administrative Claim, either (A) an amount equal to the unpaid amount of such Allowed Administrative Claim in cash commencing on the later of (i) the Effective Date, (ii) the date that such Claim becomes an Allowed Administrative Claim by a Final Order, or (iii) a date agreed to by the Claimholder and the Debtor; or (B) such other treatment (i) as may be agreed upon in writing by the Claimholder and the Debtor, or (ii) as the Bankruptcy Court has ordered or may order. Notwithstanding the foregoing, Allowed Administrative Claims representing (a) liabilities, accounts payable or other Claims or obligations incurred in the ordinary course of business of the Debtor consistent with past practices subsequent to the Petition Date, shall be paid or performed by the Debtor in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements or contracts relating thereto; provided, notwithstanding any contract provision, applicable law or otherwise, that entitles a holder of an Allowed Administrative Claim to post-petition interest, no holder of an Allowed Administrative Claim shall receive post-petition interest, on account of such Claim.

Compensation of professionals and reimbursement of expenses incurred by professionals are Administrative Claims pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Code (the "**Professional Fees** and **Expenses Claims**"). All payments to Professionals for Professional Fees and Expenses Claims will be made in accordance with the procedures established by the Code, the Rules and the Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses. The Court will review and determine all applications for compensation for services rendered and reimbursement of expenses.

All entities seeking an award by the Court of Professional Fees and Expenses shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date pursuant to section 330 if the Code and Rule 2016 by the date that is ten (10) days after the Effective Date or such other date as may be fixed by the Court.

### Priority Tax Claims

Each holder of an Allowed Priority Tax Claim shall receive, at the sole discretion of the Debtor, and in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (A) an amount equal to the unpaid amount of such Allowed Priority Tax Claim in cash commencing on the later of (i) the Effective Date, (ii) the date that such Claim becomes an Allowed Priority Tax Claim by a Final Order, or (iii) a date agreed to by the Claimholder and the Debtor; (B) as provided in section 1129(a)(9)(C, cash payments made in equal monthly installments beginning on the Effective Date, with the final installment payable not later than the sixtieth (60th) month following the Petition Date, together with interest (payable in arrears) on the unpaid portion thereof at the existing statutory interest rate from the Effective Date through the date of payment thereof; or (C) such other treatment as to which the Debtor and such Claimholder shall have agreed in writing or the Bankruptcy Court has ordered or may order; provided, however, that the Debtor reserves the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.

### Compensation of Subchapter V Trustee

The Subchapter V Trustee is compensated pursuant to the requirements of section 326(b) and 330 of the Bankruptcy Code. Pursuant to Section 326(b) of the Bankruptcy Code, the Subchapter V Trustee's compensation cannot exceed 5% of the payments made under the Plan by the Debtor. Pursuant to section 330(a) of the Bankruptcy Code, the Court may award reasonable compensation to the Subchapter V Trustee for actual, necessary services rendered by the Subchapter V Trustee and reimbursement for actual and necessary expenses.

a.  The Subchapter V Trustee compensation is estimated to be $23,000.00 through confirmation. The Subchapter V Trustee will apply to the Court for an award of compensation through the application process that is used by professionals. The Subchapter V Trustee will file a final fee application for compensation to be heard with the other final fee applications in the case.

b.  Regardless of whether the Plan is confirmed on a consensual or non-consensual basis, the Subchapter V Trustee will remain in place throughout the life of the Plan, and the Subchapter V Trustee may be entitled to additional compensation for services provided after confirmation. The Subchapter V Trustee shall invoice the Reorganized Debtor for any post-petition services or expenses throughout the life of the Plan, and such invoices shall be paid pursuant to the payment terms described in any such invoice. To the extent the Debtor objects to payment of a post-confirmation invoice of the Subchapter V Trustee, and the Debtor and the Subchapter V Trustee are not

able to consensually resolve such dispute, the Subchapter V Trustee may file additional or supplemental fee applications with the Court for approval. Upon approval of the Subchapter V Trustee's fee applications, as long as all professional administrative claims are similarly treated in the Plan, the Debtor shall pay all fee amounts due to the Subchapter V Trustee on the effective date of the Plan and pay the Subchapter V Trustee's invoices (if agreed) or fee applications to the extent, and in the amount approved by the Court, over the remaining life of the Plan.

The following chart lists the Debtor's estimated Administrative expenses and their proposed treatment under the Plan:

| TYPE | ESTIMATED AMOUNT OWED | PROPOSED TREATMENT |
| --- | --- | --- |
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $0.00 | Paid in full on the Effective Date of the Plan, or according to terms of obligation, if later. The Debtor has been paying post-petition expenses in the normal course and does not believe that any amounts are due and owing. |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $0.00 | N/A |
| Professional Fees, as approved by the Court | Est $110,000.00 includes estimated fees through confirmation for Subchapter V Trustee of $23,000.00 | **Counsel for Debtor to be Paid in full on the Effective Date of the Plan or per separate agreement. Subchapter V Trustee to be paid in full on the Effective Date of the Plan and/or through life of the Plan per separate agreement.** |
| Internal Revenue Service 2023 Tax Liability (POC-7) | $20,687.49 | Paid in full on the Effective Date of the Plan, or according to terms of obligation, if later. |
| Clerk's Office Fees | $0.00 | N/A |
| Other Administrative Expenses | $0.00 | N/A |
| **TOTAL** | **$153,687.49** | |

## B.    Classes of Secured Claims

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to set off) to the extent allowed as secured claims under 11 U.S.C. §506. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

| Claim | Impairment | Treatment |
|---|---|---|
| Class 1: Secured claim of Ally Bank for $52,709.54 (POC-4 for purchase money loan for a 2021 Chevrolet Silverado.<br><br>Term: 84 months from May 2021<br><br>Interest: 8.345%<br><br>Monthly Payment: $1,071.42 | Unimpaired | **Class 1** consists of the secured claim of Ally Bank for $52,709.54 (POC-4) for a purchase money loan for a 2021 Chevrolet Silverado, VIN# 1GCPYFEDXMZ272594 at $1,071.42 per month for seven years, which commenced in May 2021 and will end in 2028. Debtor adopts and reaffirms the loan and is current in monthly payments. This class is unimpaired.<br><br>Payments shall be sent to:<br>Payment Processing Center<br>P.O. Box 78367<br>Phoenix, AZ 85062 |

## C.    **Priority Unsecured Claims**

Certain priority claims that are referred to in 11 U.S.C. §§507(a)(1), (4), (5), (6) and (7) are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the Effective Date of the Plan equal to the Allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

| Claim | Impairment | Treatment |
|---|---|---|
| Internal Revenue Service (POC-2-7)<br><br>Priority claim for 2021: $121,772.86 @ 4%<br><br>Monthly Payments: 24 months @ $2,000.00 and then 16 months @ $5,142.12 | Unimpaired | The IRS tax claim as amended (POC-2-7) is for 2021 1040 taxes in the amount of $164,443.35, with $121,772.86 being the priority claim, and $42,670.49 is an unsecured claim. This liability will be paid within the time period required by the code through monthly payments (i.e. 60 months from the filing of the chapter 11 petition). Assuming 40 months left in the payback period, including 4% interest, the monthly IRS payments will be $2,000.00 for the first 24 months and then $5,142.12 for the next 16 months. The unsecured portion of the IRS claim of $42,670.49 will be paid as part of Class 2, with a distribution of 30.1%.   To the extent that the IRS files an amended claim, the monthly payments will be amended accordingly to be compliant with the payback period set forth in the bankruptcy code. |

| Claim | Impairment | Treatment |
|---|---|---|
| | | Payments shall be sent to:<br><br>IRS<br>801 Broadway<br>M/S MDP 146<br>Nashville TN 37203 |
| Georgia Department of Revenue (POC-6)<br><br>Priority Claim: $39,452.01 at 4%<br><br>Monthly Payments:<br>24 months @ $500.00 and then 16 months @ $1,887.88 | Unimpaired | The Georgia Department of Revenue has filed a priority claim for income taxes in the amount of $39,452.01 for 2020 and 2021(POC-6). This liability will be paid within the time period required by the code through monthly payments (i.e., 60 months from the filing of the chapter 11 petition). Assuming 40 months left in the repayment period, the monthly payment to the Georgia Department of Revenue, including interest at 4% will be $500.00 for the first 24 months and then $1,887.88 for the next 16 months. The Georgia claim also includes a general unsecured portion for $5,801.10. This is being paid as part of Class 2, with a distribution of 30.1%. Payments shall be made to:<br><br>Georgia Department of Revenue<br>Compliance Division, ARCS - Bankruptcy<br>1800 Century Blvd. NE Ste 9100<br>Atlanta, GA 30345-3205 |

**D.  <u>General Unsecured Claims</u>**

General unsecured claims are not secured by property of the estate and are not entitled to priority under 11 U.S.C. §507(a). The following chart identifies the Plan's proposed treatments of Class 2, which contain general unsecured claims against the Debtor.

| Class | Impairment | Treatment |
|---|---|---|
| **Class 2** – General Unsecured Class<br><br>Total Claims Amount: **$3,980,075.03**<br><br>Plan Payments: A total of $1,198,934.00 will be paid over 20 quarters, in varying quarterly payments:<br><br>Year 1 - $44,905.50 | **Impaired** | **Class 2** consists of the general unsecured class containing ten allowed claims totaling **$3,980,075.03.** The largest claim is the judgment held by Ms. Almánzar in the amount of $3,911,680.95 (includes interest) (POC-5). The balance of the class consists of nine claims totaling $68,395.28. Consistent with Code section 1191(c)(2), the net income of the Debtor supplemented with payments from Yelen for income attributable to the Debtor, after paying all expenses and other higher priority classes will be paid to this class over five years. The Code |

| | | |
|---|---|---|
| Year 2 - $55,905.50<br>Year 3 - $57,557.50<br>Year 4 - $60,307.50<br>Year 5 - $81,057.50<br><br>Distribution to Unsecured Creditors: estimated at 30.1234% | | provides that if the plan is not consensual and is confirmed under 1191(b) the distribution to the unsecured class, as required by section 1191(b), shall be fair and equitable and will be calculated as part of the total income received under the plan, which in total distributions shall not be less than the projected disposable income as required by 1191(c) and defined by 1191(d). A total of $1,198,934.00 will be paid over 20 quarters, in varying quarterly payments:<br><br>Year 1 - $44,905.50 per quarter<br>Year 2 - $55,905.50 per quarter<br>Year 3 - $57,557.50 per quarter<br>Year 4 - $60,307.50 per quarter<br>Year 5 - $81,057.50 per quarter<br><br>The total payment to the unsecured class equals a total distribution of 30.1% of allowed claims. This class is impaired. The bar date for claims was August 3, 2023. |

### Summary of General Unsecured Claims

| Creditor Name | Payment Frequency | Estimated Total Plan Payment | Total Amount of Claim |
|---|---|---|---|
| American Express | Quarterly | $1,837.89 | $6,101.22 |
| Bank of America | Quarterly | $920.87 | $3,057.00 |
| Belcalis Marlenis Almánzar | Quarterly | $1,178,312.34 | $3,911,680.95 |
| Discover Bank | Quarterly | $1,734.68 | $5,758.57 |
| Georgia Tax | Quarterly[8] | $1,747.49 | $5,801.10 |
| Internal Revenue Service | Quarterly[9] | $12,853.80 | $42,670.49 |
| Mak Anesthesia | Quarterly | $512.10 | $1,700.00 |
| Penn Credit Corp. | Quarterly | $62.25 | $206.66 |
| Professional Account Mgmt | Quarterly | $837.44 | $2,780.04 |
| Progressive | Quarterly | $96.10 | $319.00 |

The aggregate amount of claims included in Class 2 is **$3,980,075.03.**

Based upon the total distribution over 5 years, the 10 allowed unsecured claimants will receive a distribution of approximately $1,198,934.00 or 30.1 % of the total claims. This distribution is higher than what allowed general unsecured claimants would receive in a

---

[8] Distributions on account of Georgia tax claims will be paid quarterly for the first 16 quarters of the plan.
[9] Distributions on account of IRS tax claims will be paid quarterly for the first 16 quarters of the plan.

hypothetical Chapter 7 in which case the Debtor estimates that such claimants would receive a distribution of $-0- (see Liquidation Analysis - Exhibit "A").

## ARTICLE III

### A. Designation of Impaired and not Impaired Classes

Class 1 is unimpaired and not entitled to vote.
Class 2 is impaired and entitled to vote.
IRS claim is unimpaired and not entitled to vote.
Georgia tax claim is unimpaired and not entitled to vote.

### B. Voting of Claims and Equity Interests

The Bankruptcy Code entitles only holders of impaired claims or equity interests who receive some distribution under a proposed plan to vote to accept or reject that plan. Holders of claims or equity interests that are unimpaired under a proposed plan are conclusively presumed to have accepted that plan and are not entitled to vote on it. Holders of classes of claims or equity interests that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, also not entitled to vote on it. 11 U.S.C. §1126(f)-(g).

## ARTICLE IV

### *Provisions Covering Distribution, General Provisions*

The rights afforded in this Plan and the payments and distributions to be made hereunder shall be in exchange, satisfaction, discharge, and release of all existing claims of any kind, nature or description whatsoever against Debtor or any of her assets or properties, except for claims that have been determined by the Court to be non-dischargeable, such as POC-5; and, except as provided in Section 1192 of the Code, upon the Effective Date, all existing claims against the Debtor shall be, and be deemed to be, exchanged, satisfied, discharged, and released in full; and all holders of claims shall be precluded from asserting against the Debtor or her assets or properties or successors in interest, any other or further claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

The distributions that are made to the various classes of creditors hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any creditor of a senior class by reason of claimed contractual subordination rights, so that each creditor will have, receive, and retain the sole and exclusive benefit of the distributions set forth in this Plan.

Except as otherwise provided by this Plan or by separate order of the Court, upon the consummation date, title to all assets and properties dealt with by this Plan shall vest in the Debtor or her successor in interest, free and clear of all claims and the Confirmation Order shall be a discharge of Debtor's liabilities, except as provided for herein.

Except as provided herein and subject to confirmation of the Debtor's Plan, Debtor reserves the right to pursue any action against third parties, including but not limited to causes of action

against creditors of the estate in state court, U.S. District Court, or appellate court, including causes related to the claims against this estate and any vendor actions that may later arise; however, Debtor shall not pursue any action against Ms. Almánzar for any claim whatsoever, whether known or unknown as of the Petition Date, arising from or related to the facts supporting the Amended Defamation Judgment and/or POC-5. Moreover, for the avoidance of doubt, the Amended Defamation Judgment is non-dischargeable, and no provision of this Plan shall limit, waive, modify or reduce Ms. Almánzar's rights in the Amended Defamation Judgment except to the extent provided in Article VI. J, which provides for a tolling of any applicable statute of limitation and stay of collection actions against the Debtor and others (including Cheick Kebe and Yelen) as described in Article VI. J during the pendency of the Plan so long as there are no uncured defaults in Plan payments to Ms. Almánzar.[10]

Creditors may amend their proofs of claims prior to the Confirmation of Debtor's Plan and the actual aggregate number of Allowed Claims may differ significantly from the amounts used for the purposes of Debtor's estimates. As a result, Debtor reserves for itself the right to object to all objectionable proofs of claims. The Debtor has been reviewing and analyzing Claims on an ongoing basis and has not identified any objectionable claims.

**A.  Method of Distribution Pursuant to the Type of Confirmed Plan**

1.  <u>Consensual Plan</u> - If the Plan of the Debtor is confirmed under section 1191(a) of the Bankruptcy Code, the service of the trustee appointed under Subchapter V of Chapter 11 (the "Subchapter V Trustee" or "Trustee") in the case shall continue through the life of the Plan. The Debtor shall make all payments under the Plan, including any deposits required by the Plan to be distributed on confirmation or through the life of the Plan.

(a)  Subject to Rule 9010, and except as otherwise provided herein, all distributions under a Consensual Plan shall be made by the Reorganized Debtor to the holder of each Allowed Claim at the address of such holder as listed on the Schedules and/or Proof of Claim as of the distribution record date unless the Debtor or Reorganized Debtor has been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that provides an address different from the address reflected on the Schedules.

(b)  Any payment of Cash made by the Reorganized Debtor pursuant to a Consensual Plan shall be made by check drawn on a domestic bank or by wire transfer.

(c)  Any payment or distribution required to be made under a Consensual Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(d)  Any distributions of Cash or other property pursuant to a Consensual Plan that is unclaimed for a period of six (6) months after the distribution date shall constitute Unclaimed Funds and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

---

[10] So long as timely Plan payments are made to Ms. Almánzar consistent with the Plan, the injunctive language of Article VI.J. shall remain in full force and effect as to Ms. Almánzar.

(e) Unless otherwise provided herein, all initial distributions and deliveries to be made on the Effective Date shall be made on the initial distribution date. Subsequent distributions shall be made in accordance with the terms set forth in the Plan.

(f) At the close of business on the distribution record date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtor shall have no obligation to recognize any transfer of any Claims occurring after the distribution record date; provided, however, that the foregoing will not be deemed to prohibit the sale or transfer of any Claim subsequent to the distribution record date and prior to the Effective Date.  The Debtor shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the distribution record date.

(g) If the Debtor fails to timely make any payment due under the Plan, the Trustee may file and serve a notice of delinquency upon the Debtor and the Debtor's attorney. The Debtor shall have 30 days from the date of the notice of delinquency to make all payments due under the Plan, including any payments that become due within the 30-day period. If the Debtor is not current with plan payments on the 30th day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Trustee will file and serve a report of non−compliance and the Trustee and or any creditor or party in interest may thereafter seek the dismissal or conversion of the case to Chapter 7.

2.      <u>Non-Consensual or Cramdown Plan</u> - If the plan is confirmed under section 1191(b) of the Bankruptcy Code, except as otherwise provided in the plan or in the order confirming the plan, the Subchapter V Trustee shall make payments to creditors under the Plan. The following provisions shall apply to all claims and disbursements made by the Subchapter V Trustee under the plan:

(a)      The Debtor shall file with the Court as a supplement to the Plan and provide notice to all creditors at or before confirmation, a list of all the creditors who will be receiving payments under the Plan, the total amount to be paid to each creditor under the Plan (inclusive of all allowed interest and fees) and the payment terms and schedule for each creditor under the Plan.

(b)      The Debtor shall timely pay to the Trustee all funds needed to make payments to creditors under the Plan.  If the Debtor fails to timely make any Plan payment to the Trustee, the Trustee may file and serve a notice of delinquency upon the Debtor and the Debtor's attorney.  The Debtor shall have 30 days from the date of the notice of delinquency to make all payments due under the Plan, including any payments that become due within the 30-day period. If the Debtor is seeking to cure the delinquency in a modified plan the Debtor must file a motion to modify the confirmed Plan within 30 days of the date of the notice of delinquency.  If the Debtor is not current with plan payments on the 30 day after the date of the notice of delinquency or has not filed a motion to modify within that time period, the Trustee will file and serve a report of non−compliance and the Trustee and or any creditor or party in interest may thereafter seek the dismissal or conversion of the case to Chapter 7.

(c) Within two (2) weeks of receiving the funds from the Debtor to make the Plan payments, the Trustee will disburse the amounts collected from the Debtor to the holders of allowed claims pursuant to the treatment in their respective classes and as indicated below:

 i. All payments under the plan will be made by the Trustee to the holder of each allowed claim at the address of such holder as listed on the Schedules and/or Proof of Claim, unless the Trustee has been notified in writing of a change of address.

 ii. Any payment required to be made under the plan on a day other than a business day shall be made on the next succeeding business day.

 iii. Any distributions of cash or other property under the plan that is unclaimed for a period of six (6) months after such distribution was made shall constitute unclaimed property and any entitlement of any holder of any claim to such distribution shall be extinguished, forever barred, and shall be returned to the Debtor.

 iv. Claimants shall not be permitted to amend or otherwise modify any claim after the later of the claims bar date or the confirmation date without leave of the Bankruptcy Court. Any amendment to a claim filed after the later of the claims bar date or the confirmation date shall be deemed disallowed in full and expunged without any action by the Trustee unless the claimholder has obtained prior Court authorization for the filing of such amendment.  The Trustee shall have no obligation to recognize any transfer of any claim after distributions have started.

 v. Unless expressly provided in the plan or the confirmation order, post-petition interest and fees shall not accrue on or after the Petition Date on account of any claim.

3. During the pendency of this case and through the term of the Plan, the Debtor shall provide copies of yearly income tax returns simultaneously to the Trustee and counsel for Ms. Almánzar (but not file with the Court) no later than 30 days after the filing of the income tax return with the underlying taxing authority.

4. During the pendency of this case and through the term of the Plan, the Reorganized Debtor shall file post-confirmation quarterly operating reports on or before the twenty-first day of the month after the end of each calendared quarter. To the extent the Debtor's actual disposable income, as reflected in the quarterly post-confirmation operating reports exceeds the Debtor's *projected* disposable income in the Plan, the distribution to Class 2 unsecured creditors will be based upon the Debtor's actual disposable income. If the Debtor's actual disposable income is less than the Debtor's projected disposable income, distribution to Class 2 unsecured creditors will nonetheless be based on the Debtor's projected disposable income.

5. During the pendency of this case and through the term of the Plan, should the Debtor become a direct or indirect owner of any company, direct or indirect beneficiary of any domestic

or offshore trust, such interest shall be disclosed to the Trustee and counsel for Ms. Almánzar within 10 days of such occurrence.

### B.  Disputed Claims

Notwithstanding any other provision of the Plan, if any portion of a Claim is disputed, the full amount of such Claim shall be treated as a Disputed Claim for purposes of this Plan, and no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or Allowed Equity Interest (in whole or in part).

### C.  Disallowed Claims

All Claims held by Persons against whom the Debtor or Reorganized Debtor has commenced an Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Code, shall be deemed "disallowed." Claims pursuant to section 502(d) of the Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Estate from such party have been paid, Debtor has not commenced any action, nor has Debtor identified any actions to be commenced under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Code.

### D.  No Recourse

Notwithstanding that the Allowed Amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Code and Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the subchapter V Trustee, the Disbursing Agent, the Debtor, the Reorganized Debtor, the Equity Security Interests or any of its current managers, officers, directors, employees, counsel, advisor, respective professionals, consultants, or Affiliates or their respective successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Code. **THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS**.

### E.  Amendments to Claims

A Claim may be amended prior to the Confirmation Date only as agreed upon by the Debtor and the holder of such Claim, or as otherwise permitted by the Court, the Rules or applicable law. After the Confirmation Date, a Claim may not be amended without the authorization of the Court. Any amendment to a Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any action by the Debtor, the Reorganized Debtor or the Estate, unless the Claim holder has obtained prior Court authorization for the filing of such amendment.

### F. Post-Petition Interest on Claims

Unless expressly provided in the Plan, the Confirmation Order, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan or required by applicable law, post-petition interest shall not accrue on or after the Petition Date on account of any Claim.

### G. Non-Disparagement Clause

As a condition of the Debtor's Subchapter V Plan of Reorganization, the Debtor on behalf of herself, and her estate, her heirs, and her affiliated entities, and the representatives, agents, employees, and contractors of Debtor, her estate, her heirs, her affiliated entities, and any other company in which the Debtor has a direct or indirect interest (collectively, the "Debtor Parties"), agrees not to publicly make, publish, or communicate, whether directly or indirectly, any derogatory, disparaging, or defamatory statements, remarks, or comments (a "Prohibited Comment") about Ms. Almánzar,  her family members (including without limitation her children born prior to or after the Petition Date, husband, siblings, parents, step-parents, grandparents, aunts, uncles, nieces, nephews and cousins (excluding any cousins more removed than second cousins), and/or any/all entities owned or controlled by Ms. Almánzar (collectively, the "Almánzar Parties") in any public form or medium, including but not limited to social media accounts, websites, blogs, or other communication channels and including but not limited to those owned or controlled, fully or partially, by the Debtor Parties and/or by Cheickna Kebe and/or by Yelen Entertainment, LLC and further including but not limited to "unwinewithtashak," "The Wine Cellar Podcast," or "Tasha K Live."

The Debtor shall ensure that no content related to Ms. Almánzar and/or her family, whether explicitly or implicitly, will be published or disseminated on any of the Debtor's social media accounts, websites, blogs, or other online communication channels, including without limitation "unwinewithtashak," "The Wine Cellar Podcast," or "Tasha K Live."

Any of the Almánzar Parties not known to be related to Almánzar by the Debtor and/or by the general public shall be referred to herein as an "Unidentified Almánzar Party." To the extent a Prohibited Comment is made with respect to an Unidentified Almánzar Party, Almánzar or any person acting on her behalf shall give written notice to: i) the Debtor and her counsel, Chad Van Horn, via e-mail at: tashatkebe@gmail.com, chad@cvhlawgroup.com and chapter11@cvhlawgroup.com; and ii) to Mr. Kebe and Yelen Entertainment, LLC and their counsel at: directorcheick@gmail.com and brett@elrolaw.com (a "Prohibited Comment Violation Notice"). The Debtor Parties shall have forty eight (48) hours from receipt of the Prohibited Comment Violation Notice to remove any content constituting a Prohibited Comment from any place, including but not limited to social media platforms and including but not limited to those owned or controlled by the Debtor Parties or any company owned or controlled fully or partially by Cheickna Kebe, including without limitation Yelen Entertainment, LLC, and thus cure any violation of the Non-Disparagement Agreement. Once an Unidentified Almánzar Party has been identified as related to Almánzar, such party shall no longer be deemed an Unidentified Almánzar Party.

This provision remains in place for the Debtor for the duration of this Subchapter V Plan of Reorganization under of the Bankruptcy Code. Failure to implement a timely cure to any violation within this provision shall constitute a material breach of the Plan and may result in additional legal remedies sought by Ms. Almánzar, including without limitation the legal right to seek dismissal of the Debtor's bankruptcy case or conversion to a Chapter 7 of the Bankruptcy Code.

### H. Unclaimed Distributions

Upon return of any plan distribution made pursuant to Section 1191(a) of the Code by the Debtor or its agent, Debtor shall issue letter correspondence to the last known address indicated on Debtor's schedules or applicable proof of claim. Debtor's correspondence shall include a check for the applicable Plan Payment and provide all necessary case information to enable Creditor's determination of the applicability of Debtor's plan payment. Any payments made pursuant to Plan that are unclaimed for a period of six (6) months shall be forfeited by the holder and will be re-deposited in the Disbursing Agent's account in accordance with 11 U.S.C. §347(b).

## ARTICLE V

*Executory Contracts and Unexpired Leases*

### A. Assumption or Rejection of Executory Contracts and Unexpired Leases

The Bankruptcy Code gives the Debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. Rejection or assumption may be affected pursuant to a plan of reorganization.

Pursuant to sections 365(a) and 1123(b)(2) of the Code, all Executory Contracts and unexpired leases between the Debtor and any Person, as set forth in the table below, shall be deemed assumed by the Reorganized Debtor as of the Effective Date, except for any Executory Contract or unexpired lease (i) which previously has been assumed or rejected pursuant to an order of the Court entered prior to the Effective Date or (ii) as to which a motion for approval of the assumption or rejection of such Executory Contract or unexpired lease has been filed and served prior to the Effective Date.

| Party to Executory Contract or Unexpired Lease | Description | Payment(s) |
|---|---|---|
| NONE | | |

**TO THE EXTENT THERE ARE ANY EXECUTORY CONTRACTS OR LEASES REJECTED BY THE DEBTOR, ANY PROOF OF CLAIM FOR DAMAGES ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR LEASE MUST BE FILED WITH THE COURT WITHIN THIRTY DAYS AFTER THE ENTRY OF THE ORDER CONFIRMING THE PLAN.**

# ARTICLE VI

*Provisions for Execution and Implementation of the Plan*

### A.  General

Upon confirmation of the Plan, and in accordance with the Confirmation Order and Subchapter V of Chapter 11, the Debtor or Reorganized Debtor, as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan.

### B.  Funding

Funding for the Debtor's Plan will come from the Debtor's future earnings and from payments made from the Yelen Contribution based upon income attributable to Debtor.

### C.  Effectiveness of Securities, Instruments and Agreements

On the Effective Date, all documents and agreements entered into or documents issued pursuant to the Plan and/or any agreement entered into or instrument or document issued in connection with any of the foregoing, as applicable, shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

### D.  Approval of Agreements

Entry of the Confirmation Order shall constitute approval of the Plan documents and all such transactions, subject to the occurrence of the Effective Date.

### E.  No Change of Control

Any acceleration, vesting or similar change of control rights of any Person or Entity in an arrangement with the Debtor that could otherwise be triggered by the entry of the Confirmation Order or the consummation of the Plan or any of the transactions contemplated thereby shall be deemed to be waived and of no force or effect.

### F.  Administration After the Effective Date

After the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire, and dispose of its property, free of any restrictions of the Code and Rules.

### G.  Term of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Case under sections 105 or 362 of the Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### H. <u>Re-vesting of Assets</u>

Except as otherwise provided in the Plan and, pursuant to sections 1141 and 1186 of the Code, if the Plan is confirmed under section 1191(a), the property of the Estate of the Debtor shall re-vest in the Reorganized Debtor on the Effective Date, free and clear of all Liens, Claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan or the Confirmation Order.

### I. <u>Discharge of Debtor</u>

This Plan, if confirmed under section 1191(a), provides that upon the Effective Date, if the Debtor is a corporation, it shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in section 1141(d)(6). However, any liability imposed by the Plan will not be discharged. If this Plan is confirmed under section 1191(b), then as soon as practicable after completion of payments due as required by the Plan, the Court shall grant discharge under section 1141(d)(1)(A). The individual Debtor shall receive a discharge upon completion of all payments under the Plan or upon satisfaction of §1141(d)(5)(B).

### J. <u>Stay of Certain Conduct Related to Discharge</u>

1.      Upon the Effective Date of the Plan, all Persons who received actual notice of this plan, and have been, are or may be holders of Claims (including Late Filed Claims) against the Debtor shall be enjoined from taking any actions against or affecting the Debtor, or the Reorganized Debtor, the Subchapter V Trustee, the Disbursing Agent, or any of their respective property on account of such Claims or Equity Security Interest (other than actions brought to enforce any rights or obligations under the Plan). This **<u>does not</u>** include Cheick Kebe and Yelen.

Upon the Effective Date of the Plan, and during the pendency of the Plan, so long as there are no uncured defaults in Plan payments to Ms. Almánzar, Ms. Almánzar solely and individually, shall be enjoined from taking any actions against or affecting the Debtor, or the Reorganized Debtor, the Subchapter V Trustee, the Disbursing Agent, the Debtor's Insiders and Affiliates, **specifically including Cheick Kebe and Yelen,**[11] and any of their current managers, officers, directors, employees, counsel, advisors, respective professionals, consultants, Insiders and Affiliates and their respective successors or assigns (the "Affected Parties"), or any of their respective property on account of such Claims or Equity Security Interest (other than actions brought to enforce any rights or obligations under the Plan) and Ms. Almánzar has agreed in writing to this treatment of her claims.

Each of the above include, without limitation:

i. Against the filing, commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, with respect to any property of any of the foregoing or any direct or indirect

---

[11] The stay conduct contemplated herein shall specifically apply to any claim by Ms. Almánzar only against Cheick Kebe and Yelen and any of Cheick's Affiliates and Ms. Almánzar consents to same.

transferee of any property of, or direct or indirect successor in interest to, any of the foregoing, or any property of any such transferee or success except as specifically authorized in the Plan;

ii. Enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting or otherwise recovering by any means or in any manner, whether directly or indirectly, any judgment award, decree or other Order against the Debtor, with respect to any property of any of the foregoing or any of the direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing, or any property of any such transferees or successor, except as specifically authorized in the Plan;

iii. Creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any liens or encumbrances against the Debtor, with respect to any property of any of the foregoing or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing, or any property of any such transferee or successor except as specifically authorized in the Plan;

iv. Setting-off, seeking reimbursement or contribution from or subrogation against or otherwise recouping in any manner, directly or indirectly, any amount against any liability owed to the Debtor, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing except as specifically authorized in the Plan; or

v. Proceeding in any manner and any place with regard to liquidating any Claim in any forum other than United States Bankruptcy Court for the Southern District of Florida or, if that Court does not have jurisdiction thereon, in the United States District Court for the Southern District of Florida, or any court in the State of Florida with competent jurisdiction

2.    <u>Tolling of Applicable Statute of Limitations</u>.

i.        Assuming neither Debtor nor any of Debtor's Insiders and/or Affiliates are in uncured breach of this Plan, all applicable statutes of limitations for any claims or causes of action that Ms. Almánzar may have against the Debtor's Insiders (including Cheick Kebe and Yelen) and their Affiliates shall be tolled for the duration of the Plan. Assuming neither Debtor nor any of Debtor's Insiders and/or Affiliates are in uncured breach of this Plan, this tolling period ("Tolling Period") shall commence on the Effective Date of the Plan and continue until the Plan is fully consummated or otherwise terminated by the Bankruptcy Court. During this time, no claim or cause of action that a creditor has or may have against the Debtor's Insiders and their Affiliates is barred by any statute of limitations that would have otherwise expired during the Plan's term. The Tolling Period shall be excluded from, and not be counted in computing the running of time under any statute of limitations or other time-based defenses that might be asserted as a bar or limitation to any such claim, suit or action, and the Debtor and Debtor's Insiders and Affiliates forever irrevocably waive the same.

3.      Exception to Stay for Commencing Actions to Preserve Claims

i.        Notwithstanding any other provision of this Plan or the Bankruptcy Code, the stay described in this section J shall not bar the filing of any complaint, claim, or other action by Ms. Almánzar solely to preserve a cause of action that would otherwise be extinguished by an applicable statute of repose. Any such action shall be limited to filing and preserving the claim or cause of action to avoid its expiration under the applicable statute of repose and shall not proceed to adjudication or enforcement without further relief from the Bankruptcy Court.

## K.  Votes Solicited in Good Faith

The Debtor has, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and on account of such solicitation will not, be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## L.  Legal Proceedings

### Potential Bankruptcy Causes of Action

Except as otherwise provided expressly in Debtor's Plan of Reorganization, including, without limitation, subsection (b) below, or in any contract, instrument, release or other agreement entered into in connection with the Plan or by Order of the Court, in accordance with §1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce any claims, rights, and causes of action under §§ 544 through 550, inclusive, of the Bankruptcy Code or any other applicable law. Debtor may pursue any such claims, rights and causes of action in accordance with what it determines to be in its best interests. Debtor is not able to determine the viability of the potential causes of action set forth above at the current time, nor has the Debtor determined a cost benefit analysis of said actions. As a result, Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions. If the Debtor, in its sole discretion, elects to pursue any cause of action and is successful in pursuing same, any collections above the cost of the litigation, will be split 50-50 between the Debtor and the unsecured creditors, who would receive a pro rata share of 50% of the collections.

### Preservation of Claims and Causes of Action

Debtor shall retain the right to prepare, file, pursue, prosecute, and settle the causes of action, whether or not such causes of action have been asserted or commenced as of the Effective Date, as a representative of the estate pursuant to 11 U.S.C. §1123(b)(3)(B).

To the extent that certain causes of action are filed by the Debtor, and are not resolved prior to the Effective Date, such causes of action will re-vest in the Debtor pursuant to the terms of the Plan.

**Notices**

Any notice described in or required by the terms of this Plan or the Code and Rules shall be deemed to have been properly given when actually received or if mailed, five days after the day of mailing, if such shall have been sent by certified mail, return receipt requested, and if sent to:

| | |
|---|---|
| The Reorganized Debtor addressed to: | Latasha Transrina Kebe<br>300 SE 2nd Street, #600<br>Fort Lauderdale, Florida 33301 |
| With copies to: | Van Horn Law Group, P.A.<br>500 N.E. 4th Street, Suite 200<br>Fort Lauderdale, Florida 33301 |
| and | Maria Yip, Subchapter V Trustee<br>2 S. Biscayne Blvd, #2690<br>Miami, Florida 33131 |
| | James C. Moon, Esq.<br>Meland Budwick, P.A.<br>3200 Southeast Financial Center<br>200 South Biscayne Blvd.<br>Miami, Florida 33131 |

## ARTICLE VII

*Confirmation and Effectiveness of the Plan*

**A.    Conditions Precedent to Confirmation**

The Plan shall not be confirmed by the Court unless and until the following conditions shall have been satisfied or waived.

(i)    The Confirmation Order shall be in form and substance reasonably acceptable to the Debtor and include, among other things, a finding of fact that the Debtor and the Reorganized Debtor, acted in good faith within the meaning of and with respect to all of the actions described in section 1125(e) of the Code and are, therefore, not liable for the violation of any applicable law, rule or regulation governing such actions;

(ii)    The Confirmation Order shall have been entered and shall be a Final Order (with no modification or amendment thereof), and there shall be no stay or injunction that would prevent the occurrence of the Effective Date;

(iii)    If the Plan is confirmed under Section 1191 (a) of the Code, that the statutory fees owing to the Subchapter V Trustee through and including confirmation shall have been paid in full; and

(iv)    All other actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtor and remain in full force and effect or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

**B.**    **Effect of Failure**

If each condition to the Effective Date specified in the Plan has not been satisfied or duly waived within ninety (90) days after the plan Effective Date, then upon the filing of a motion by the Debtor made before the time that all conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Plan shall be deemed null and void in all respects, including without limitation the discharge of Claims pursuant to section 1141 of the Code and the assumptions or rejections of executory contracts and unexpired leases as provided by the Plan, and nothing contained herein shall (l) constitute a waiver or release of any Action by, or Claims against, the Debtor or (2) prejudice in any manner the rights of the Debtor.

**C. Waiver of Conditions**

The Debtor may waive one or more of the conditions precedents to confirmation of the Plan, or the condition precedent to effectiveness of the Plan set forth herein. The Debtor may waive in writing one or more of the other condition precedents to confirmation and effectiveness of the Plan, without further notice to parties in interest or the Court without a prior hearing.

## ARTICLE VIII

*Retention of Jurisdiction*

The Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Case and the Plan pursuant to, and for the purposes of, sections 105(a) ,1142, 1183, 1185 and 1193 of the Code and for, among other things, the following purposes:

A.    Determination of all issues and disputes regarding title to property of the estate, and determination of all causes of action, controversies, duties or conflicts, whether or not subject to litigation or proceedings pending as of the Confirmation date, between the Debtor and any other party, including but not limited to, any right of the Debtor to recover assets pursuant to the provisions of the Code and Rules.

B.    Fix allowances of compensation and reimbursement of expenses pursuant to §330 of the Code.

C.    Correct any defect, cure any omission, or reconcile any inconsistency in this Plan or the Order of Confirmation as may be necessary or appropriate to carry out the purposes and intent of this Plan.

D.      Determine pending applications for the assumption or rejection of executory contracts and unexpired leases under §365 of the Code and determine the allowance of Claims resulting therefrom;

E.      To consider any amendments or modifications to this Plan as allowed by section 1193 of the Code.

F.      To issue such orders as are necessary or appropriate to carry out the provisions of this Plan, including without limitation the appointment of a person pursuant to F.R.C.P. Rule 70 and Rule 7070 of the Rules to act, execute and deliver documents on behalf of the Debtor to implement and consummate this Plan.

G.      To enjoin the interference with the implementation and consummation of the Plan, and to impose sanctions for any such interferences in accordance with Article IV herein.

H.      To liquidate damages in connection with any disputed, contingent or unliquidated claims.

I.      To hear and determine all controversies and disputes that may arise in connection with this Subchapter V, Chapter 11 case and in connection with the interpretation and implementation of the Plan.

J.      To determine any and all applications, adversary proceedings or contested matters pending on the Confirmation Date and arising under Chapter 11 of the Code or arising in or related to the Debtor's reorganization case under Chapter 11 and Title 11 of the Code.

K.      For such other matters as may be set forth in the Order of Confirmation.

## <u>ARTICLE IX</u>

*Miscellaneous Provisions*

**A.      <u>Effectuating Documents and Further Transactions.</u>**

The Debtor or Reorganized Debtor, as the case may be, is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to implement, effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

**B.      <u>Post-Effective Date Fees and Expenses</u>**

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay, the reasonable fees and expenses of Professionals thereafter incurred by the Reorganized Debtor, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

**C.    Amendment or Modification of Plan**

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date in conformity with section 1193(a) of the Code, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122, 1123, 1181 and 1191of the Code. If the Plan was confirmed under section 1191(a) of the Code, the Plan may be altered, amended or modified by the Debtor after the Confirmation Date but before substantial consummation of the Plan in conformity with section 1193(b) of the Code, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Code and the Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, and the circumstances warrant such alterations, amendments or modifications. If the Plan was confirmed under section 1191(b), then pursuant to section 1193(c), the Plan may be modified within 3 years, or such time not to exceed 5 years as the court may set, and after notice and a hearing, confirms the Plan, as altered, amended or modified, and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder. Prior to the Effective Date, the Debtor, without the approval of the Bankruptcy Court, and without notice to all holders of Claims and Interests, insofar as it does not materially adversely affect the interests of holders of Claims and Interests, may correct any defect, omission or inconsistency in this Plan in such manner and to such extent as may be necessary to expedite the execution of this Plan.

**D.    Severability**

In the event that the Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**E.    Filing of Additional Documents**

On or before Substantial Consummation of the Plan, the Debtor shall file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**F.**     <u>No Admissions</u>

Notwithstanding anything in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by any Person with respect to any matter set forth in the Plan or herein.

**G.**     <u>Substantial Consummation</u>

The Plan shall be deemed to be substantially consummated under sections 1101 and 1193 of the Code upon commencement of distributions under the Plan.

**H.**     <u>Inconsistency</u>

In the event of any inconsistency between the Plan and any Exhibit to the Plan or the any other instrument or document created or executed pursuant to the Plan, the text of the Plan shall govern. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

**I.**     <u>Remedy of Defects</u>

After the Effective Date, the Reorganized Debtor may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan and in form and substance satisfactory to the Reorganized Debtor.

## <u>ARTICLE X</u>

*Conclusion*

The aforesaid provisions shall constitute the Plan of Reorganization of the Debtor. This Plan, when approved and confirmed by the Bankruptcy Court, shall be deemed binding on the Debtor, all creditors, and all parties in interest and their successors and assigns in accordance with 11 U.S.C. §1141.

## EXHIBIT "A" - LIQUIDATION ANALYSIS

| ASSETS | | Value | Exempt Assets | Non-Exempt Assets | Liens | Net Value |
|---|---|---|---|---|---|---|
| Chevrolet Silverado | | $46,750.00 | 5000.00 | $41,750.00 | 52,709.00 | $0.00 |
| Furniture | | $2,750.00 | 2750.00 | $0.00 | | $0.00 |
| Computer | | $500.00 | 500.00 | $0.00 | | $0.00 |
| Jewelry | | $6,000.00 | $1,700.00 | $4,300.00 | | $4,300.00 |
| Whole Life Insurance | | $0.00 | $0.00 | $0.00 | | $0.00 |
| Clothes | | $2,500.00 | $0.00 | $2,500.00 | | $2,500.00 |
| Bank account as of 6/30/23 | | $5,226.74 | $0.00 | $5,226.74 | | $5,226.74 |
| | EXEMPT ASSETS: | | $9,950.00 | | | |
| | NON-EXEMPT ASSETS: | | | $46,050.00 | | $12,026.74 |

| Less: | | | | | | |
|---|---|---|---|---|---|---|
| Administrative Expenses | | | | | | |
| Chapter 7 Trustee Fee | | $1,953.00 [2] | | | | |
| Chapter 7 Administrative Expense | | $5,000.00 [3] | | | | |
| Chapter 11 Administrative Expenses | | | | | | |
| a. Chapter 11 Debtor Professional Fees (estimated) after application of retainer paid to Debtor's counsel) | | $20,000.00 | | | | |
| b. US Trustee fees | | | [4] | | | |
| | EXPENSES: | | | $26,953.00 | | |
| | TOTAL ASSETS: | | | | $12,026.74 | |

| Allowed Priority Claims | | | | | | |
|---|---|---|---|---|---|---|
| a. Georgia income tax | | $39,452.01 | | | | |
| b. Internal Revenue Service | | est$150,000 | | | | |
| | TOTAL ALLOWED PRIORITY CLAIMS: | | | | $189,452.01 | |

5 Secured Claim

| | | | | | |
|---|---|---|---|---|---|
| TOTAL SECURED CLAIMS | | | | | $0.00 |
| BALANCE: | | | | | -$150,472.00 |

Total dollar amount available to unsecured claims ........................ $0.00

Total dollar amount per Chapter 11 Plan for unsecured      $222,000.00      5.63%

Footnotes:

[1] The value of partially exempted assets = value minus applicable exemption.

[2] The Chapter 7 Trustee Fees are calculated in accordance with 11 U.S.C. §326, which provides: "In a case under Chapter 7 or 11, the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such monies in excess of $1,000,000, upon all monies disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims."

[3] Chapter 7 Administrative Costs are difficult to quantify as they vary based on whether the Trustee employs professionals who could include attorneys, accountants, appraisers and liquidators. Therefore, the $10,000.00 value is speculative and for use in this analysis only.

[4] U.S. Trustee Fees are calculated in accordance with 28 U.S.C. §§1930(3) and (6), which provides: "for a case commenced under Chapter 11 of title 11 that does not concern a railroad, as defined in section 101 of title 11, $1,000… In addition to the filing fee paid to the clerk, a quarterly fee shall be paid to the United States Trustee, for deposit in the Treasury, in each case under chapter 11 of title 11 for each quarter (including any fraction thereof) until the case is converted or dismissed, whichever occurs first. The fee shall be $325.00 for each quarter in which disbursements total less than $15,000; [and] $650 for each quarter in which disbursements total $15,000 or more but less than $75,000… The fee shall be payable on the last day of the calendar month following the calendar quarter for which the fee is owed."

# EXHIBIT "B"

LATASHA KEBE'S 5-YEARS INCOME PROJECTION

Here's a five-year income projection plan for Latasha Kebe, factoring in revenue streams, business expenses, tax liabilities, and a 5% annual growth in revenue, as well as the agreed upon contributions from Yelen.

Revenue Streams Overview (Starting Base)

- YouTube: $25,000/month = $300,000/year
- Facebook: $2,000/month = $24,000/year
- Third-Party Advertisers: $16,000/year
- Work-for-Hire Contracts: $50,000/year
- Comedy Tours: $20,000/year

Total Initial Annual Revenue

- Total Revenue (Year 1): $410,000

Projected Revenue with Annual 5% Growth

| Year | YouTube (Annual) | Facebook (Annual) | Third-Party Ads (Annual) | Work for Hire (Annual) | Comedy Tours (Annual) | Total Revenue |
|------|------------------|-------------------|--------------------------|------------------------|-----------------------|---------------|
| 1 | $300,000 | $24,000 | $16,000 | $50,000 | $20,000 | $410,000 |
| 2 | $315,000 | $25,200 | $16,800 | $52,500 | $21,000 | $430,500 |
| 3 | $330,750 | $26,460 | $17,640 | $55,125 | $22,050 | $451,575 |
| 4 | $347,288 | $27,783 | $18,522 | $57,881 | $23,152 | $474,626 |
| 5 | $364,652 | $29,172 | $19,448 | $60,775 | $24,310 | $498,357 |

Business Expenses (30%) and Tax Liability (35%)

The projected net income after deducting business expenses and tax liabilities each year.

Year 1
- Total Revenue: $410,000
- Business Expenses (30%): $123,000
- Taxable Income: $287,000
- Tax Liability (35%): $100,450
- Net Income: $186,550
- Yelen Contribution: $80,470.04
- Funds Available for Plan Payments: $267,020.04

Year 2
- Total Revenue: $430,500
- Business Expenses (30%): $129,150
- Taxable Income: $301,350
- Tax Liability (35%): $105,472.50
- Net Income: $195,877.50
- Yelen Contribution: $115,242.54
- Funds Available for Plan Payments: $311,020.04

Year 3
- Total Revenue: $451,575
- Business Expenses (30%): $135,472.50
- Taxable Income: $316,102.50
- Tax Liability (35%): $110,635.88
- Net Income: $205,466.63
- Yelen Contribution: $82,161.41
- Funds Available for Plan Payments: $287,628.04

Year 4
- Total Revenue: $474,626
- Business Expenses (30%): $142,387.80
- Taxable Income: $332,238.20
- Tax Liability (35%): $116,283.37
- Net Income: $215,954.83
- Yelen Contribution: $82,673.21
- Funds Available for Plan Payments: $298,628.04

Year 5
- Total Revenue: $498,357
- Business Expenses (30%): $149,507.10
- Taxable Income: $348,849.90
- Tax Liability (35%): $122,097.47
- Net Income: $226,752.43
- Yelen Contribution: $110,334.61
- Funds Available for Plan Payments: $337,087.04

Five-Year Summary

| Year | Total Revenue | Business Expenses (30%) | Taxable Income | Tax Liability (35%) | Net Income | Yelen Contribution | Funds Available for Plan Payments |
|---|---|---|---|---|---|---|---|
| 1 | $410,000 | $123,000.00 | $287,000.00 | $100,450.00 | $186,550.00 | $80,470.04 | $267,020.04 |
| 2 | $430,500 | $129,150.00 | $301,350.00 | $105,472.50 | $195,877.50 | $115,142.54 | $311,020.04 |
| 3 | $451,575 | $135,472.50 | $316,102.50 | $110,635.88 | $205,466.63 | $82,161.41 | $287,628.04 |
| 4 | $474,626 | $142,387.80 | $332,238.20 | $116,283.37 | $215,954.83 | $82,673.21 | $298,628.04 |
| 5 | $498,357 | $149,507.10 | $348,849.90 | $122,097.47 | $226,752.43 | $110,334.61 | $337,087.04 |