UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

LATASHA TRANSRINA KEBE,

                Debtor.

_____/

Case No.: 23-14082-SMG
Chapter 11
Subchapter V

### CREDITOR BELCALIS MARLENIS ALMÁNZAR'S REPLY TO DEBTOR'S RESPONSE IN OPPOSITION TO MOTION TO (I) ENFORCE CONFIRMED PLAN AND CONFIRMATION ORDER AND (II) AWARD ATTORNEY'S FEES AND SANCTIONS [Dkt. No. 220]

Creditor Belcalis Marlenis Almánzar, ("***Ms. Almánzar***"), by and through undersigned counsel, respectfully submits this Reply to *Debtor's Response in Opposition to Motion to (I) Enforce Confirmed Plan and Confirmation Order and (II) Award Attorney's Fees and Sanctions* ("***Response***") [Dkt. No. 220], and in support states as follows:

### PRELIMINARY STATEMENT

Debtor is not a disinterested entertainment and gossip columnist who stumbled into a legal gray area. She is the adjudicated author of a malicious, years-long defamation campaign against Ms. Almánzar; a campaign so deliberate and so damaging that a federal jury awarded nearly $4 million in compensatory and punitive damages. That judgment is nondischargeable. It will follow her. And it was the singular reason this bankruptcy case came before this Court.

The Non-Disparagement Clause in the Plan and Confirmation Order was not a peripheral condition of the confirmed Plan. It was, as undersigned counsel stated on the record at the confirmation hearing: *"really critical,"* the product of weeks of hard negotiation, and the essential *quid pro quo* for Ms. Almánzar's extraordinary concession: an agreement to stay

1

enforcement of a nearly $4 million nondischargeable judgment against Ms. Kebe, her husband, and Yelen Entertainment, LLC.[1]

Without that clause, there was no consensual plan. Without Ms. Almánzar's consent, there would have been a hearing on Ms. Almánzar's Motion to Dismiss, and this Court had already made clear what was at stake.

On January 9, 2025, at a hearing held before the Plan was confirmed, this Court addressed counsel with unmistakable clarity:

> THE COURT: We are going to have an evidentiary hearing, and I will tell, particularly Mr. Van Horn, if Mr. Moon proves even half of what he alleged – no 10 percent, the case isn't being confirmed and it's being dismissed. I mean, it's really – Mr. Van Horn, you hit the nail on the head, it's going to come down to credibility, because the allegations are damning, okay, and if he proves even a fraction of them, the case is over, okay? But I think we need evidence. But I hope your client hears me loud and clear, there's a lot he's alleged. He does not have to prove all of it. He can prove a handful of bad acts, misstatements, statements under oath that prove not to be true, failure to have real projections, any host of things, you know, and Mr. Van Horn, you can read 1129(a) just like I can, and you see what you need to prove, and you miss any one of them, you lose, and Mr. Moon's arguments, if he can prove any of this, and he suggests he has the evidence, and it's in his motion, so it would be on you to convince me that that's not the facts, he's going to win and this is going to be case over. So, I don't know what else to say.

Hr'g Tr. Jan. 9, 2025: 62:5 through 63:2.

Debtor and her counsel heard those words. She then accepted the Non-Disparagement Clause to preserve the case. She cannot now, through a contempt response, attempt to rewrite the obligation she knowingly and voluntarily accepted to avoid her case being dismissed.

---

[1] Hr. Tr. Feb. 24, 2025, 7:23–8:6 (Mr. Moon: "There was quite a bit of negotiation that went on, certainly late, but we got where we needed to get with the non-disparagement clause, **which was really critical considering the nature of the defamation judgment that had occurred**, and really all Ms. Almánzar wants is to collect on her judgment, that's it, and this is a mechanism to provide payment for that, that's it, that's the entire reason why we're doing this. We just wanted that on the record, your Honor.") (emphasis added).

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

Yet that is precisely what the Response asks this Court to do. Stripped of its rhetoric, the Response makes three requests: (1) reinterpret the Non-Disparagement Clause to exclude the very conduct it was designed to prohibit; (2) treat a narrow, specifically-defined cure mechanism for unknown family members of Ms. Almánzar as a general license to post-and-delete prohibited content at will about Ms. Almánzar and/or her known family members; and (3) invoke First Amendment doctrines that have no application to the enforcement of a consensually negotiated, court-confirmed contract. The law forecloses all three.

Debtor has demonstrated, through her own words and in public broadcasts to hundreds of thousands of followers, that she only agreed to the Non-Disparagement Clause under duress of dismissal and never intended to honor it in spirit. She has made clear she resents it, views it as an obstacle to be overcome, and intends to continue as well as to escalate and resume the very defamatory conduct that generated the $4 million judgment once the Plan terminates. These are not the actions of someone navigating an ambiguous order in good faith. These are the actions of someone of ill intent who is trying to weaponize a cure provision as a revenue-generating business model and is asking the Court to ratify that conduct as compliance.

This Court should decline that invitation. A confirmed plan is a court order. Notwithstanding Debtor's delusional belief that the law does not apply to her, willful violations of court orders must have consequences. This Reply demonstrates that each of the legal arguments advanced in the Response is either foreclosed by controlling Eleventh Circuit authority, contradicted by the plain text of the Confirmation Order, or refuted by the very cases on which the Response purports to rely. And perhaps most shocking, as discussed further herein, the Response includes reference to what appears to be a fabricated or "hallucinated" case, and otherwise includes citations that do not even remotely stand for the propositions cited.

3

## ARGUMENT

I.   **THIS IS A CONTRACT ENFORCEMENT CASE, NOT A FIRST AMENDMENT CASE**

1.      The Response devotes substantial space to First Amendment doctrine, prior restraints, the *Near* decision, *Milkovich*, and a sustained argument that prospective sanctions would unconstitutionally chill protected speech. This entire framework rests on a false premise. The Non-Disparagement Clause is not a government-imposed restriction on an unwilling speaker. It is a voluntary contractual concession, negotiated at arm's length, accepted through counsel, and incorporated into a court-confirmed Plan as the price of preserving Debtor's bankruptcy case.

2.      The First Amendment's prior restraint doctrine, developed in cases like *Near v. Minnesota*[2] to protect the press from government censorship, has its greatest force against restrictions imposed by the state on unwilling speakers. It has its weakest application, if any at all, to voluntary contractual obligations. *See Snepp v. United States*, 444 U.S. 507, 509, fn. 3 (1980) (enforcing CIA prepublication agreement as a binding contract, not a prior restraint).[3]

---

[2] 283 U.S. 697 (1931).

[3] See also, *Lothamer Tax Resolution, Inc. v. Kimmel*, Case. No. 1:25-cv-579, 2025 WL 2490380 at *9-10 (W.D. Mich., Aug. 29, 2025) (slip op.) (holding "Courts have frequently held that it is constitutional to enjoin parties from violating speech-related contractual obligations that they have voluntarily undertaken.") and citing *United Egg Producers v. Standard Brands, Inc*., 44 F.3d 940, 943 (11th Cir. 1995) ("Where two disputing parties in positions of equal bargaining power agree, through a Settlement Stipulation, to restrict, in a limited degree, their First Amendment rights on commercial speech as was done here, we hold that court enforcement of that agreement is not governmental action for First Amendment purposes."); *Biles v. Schneider,* Case No. 19-CV-48-F, 2020 WL 10356508 at *8 (D Wy. Sept. 10., 2020) (holding that the Free Speech Clause prohibits only governmental abridgment of speech) ("Moreover, even if there were state action for purposes of the First Amendment, as Plaintiff points out Schneider waived his free speech rights to the extent they were implicated in the Settlement Agreement. A party's promise to restrict his speech is enforced like any other agreement under state law. *Cohen v. Cowles Media Co*., 501 U.S. 663, 671 (1991) ("[t]he parties themselves ... determine the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed."); *USA Technologies, Inc. v. Tirpak*, 2012 WL 1889157 at *9 (E.D. Penn., May 24, 2012) ("The party asserting a waiver [of First Amendment rights] must prove by "clear and compelling evidence" that the waiver was voluntary, knowing, and intelligent. A written agreement negotiated by counsel serves as such evidence. Consideration in exchange for the restriction is also evidence of a waiver. We also look at the particular facts and circumstances surrounding the agreement, including the bargaining power of the parties, whether the terms were negotiated,

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

Debtor was not compelled to accept the Non-Disparagement Clause. She willingly but deceptively accepted it in open Court because the alternative was losing her bankruptcy case. The Constitution does not grant a party the right to breach the contracts they voluntarily made.

3.    The Response itself confirms this is a contract enforcement dispute. Debtor acknowledges that the clause was negotiated, that the Plan was confirmed, and that Debtor received its benefits. The January 9, 2025, hearing transcript makes the consideration undeniable: this Court told Debtor and her counsel in no uncertain terms that the case was over if the undersigned proved even a fraction of his allegations. Debtor accepted the Non-Disparagement Clause to prevent dismissal. Having received the benefit of that bargain - a stay of enforcement of a nearly $4 million judgment - she is bound by its terms. *See In re Dow Corning Corp.*, 456 F.3d 668, 676 (6th Cir. 2006)[4] (in interpreting a confirmed plan, courts use contract principles, since the plan is effectively a new contract between the debtor and its creditors).

4.    Accordingly, the Court's analysis begins and ends with one question: has the Debtor complied with Paragraph 14 of the Confirmation Order? The overwhelming, largely uncontested record demonstrates that she has not.

## II.    THE NON-DISPARAGEMENT CLAUSE IS NOT AMBIGUOUS, AND DEBTOR'S ARGUMENT TO THE CONTRARY IS AN IMPROPER ATTEMPT TO RELITIGATE CONFIRMED PLAN TERMS

5.    The Response argues that the Non-Disparagement Clause is "ambiguous" as applied to commentary on public figures connected to Ms. Almánzar, and that this ambiguity precludes a contempt finding. This argument fails on every conceivable level.

_____

whether the waiving party was advised by competent counsel, and whether the waiving party has engaged in other contract negotiations, to determine if there was a voluntary, knowing, and intelligent waiver.") (Internal citations omitted).

[4] This case is cited by Debtor in her Response, but it actually supports Ms. Almánzar's argument.

5

**A.      The Plain Text of Paragraph 14 of the Confirmation Order is Unambiguous**

6.      Paragraph 14(a) of the Confirmation Order states, in plain English, that "[t]he Debtor shall ensure that **no content** related to Ms. Almánzar and/or her family, whether **explicitly or implicitly**, will be published or disseminated on any of the Debtor's social media accounts, websites, blogs, or other online communication channels." (Emphasis added.) The word "implicitly" does not appear in the order by accident. It was drafted - and negotiated - to cover *precisely* the methodology Debtor has employed throughout the life of this Plan: coded but obvious references, contextual cues, crowd-sourced identification, and thinly veiled commentary that her audience of over one million followers immediately and universally understands to be about Ms. Almánzar.

7.      Debtor argues that the Confirmation Order "does not answer" when commentary on a third party like Ms. Almánzar's husband Offset becomes a prohibited implicit reference to Ms. Almánzar. But the order answers that question directly: **no content** related to Ms. Almánzar or her family, **whether explicit or implicit**, is permitted. The gap Debtor identifies does not exist in the text; Debtor has simply and disingenuously attempted to manufacture ambiguity in a provision that is clear.

8.      The Eleventh Circuit's ambiguity standard requires that an order be "susceptible to two different reasonable interpretations" before contempt is precluded. *FTC v. Leshin*, 618 F.3d 1221 (11th Cir. 2010). There is no reasonable interpretation of "**no content related to Ms. Almánzar and/or her family, whether explicitly or implicitly**" that permits defamatory posts accusing Ms. Almánzar of witness tampering,[5] not to mention the sixteen consecutive posts

---

[5] https://www.instagram.com/p/DTJgiQpj64c/ "Tasha K recently started circulating claims suggesting Cardi could be facing witness intimidation charges tied to allegations that she contacted an alleged victim connected to Stefon Diggs. Those claims quickly spilled onto social media, with Tasha tweeting old interview clips from Diggs' former

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

about Ms. Almánzar's husband following a nationally publicized shooting, published by the person who was adjudicated to have defamed Ms. Almánzar for years. The only reasonable interpretation is the one the text actually states.

9.      And this is to say nothing of the indirect coded references to Ms. Almánzar herself which were raised in the Motion and Supplement – even in the context of what Debtor would have this court believes are innocent references to Offset regarding what Debtor considers newsworthy "commentary." For example, when disparaging Offset as a result of his alleged gambling issues, Debtor mockingly observed in one of her posts:

> Hee hee hee, so Offset, was at work, you know Offset works at the casino, he is down there five times a week clocking in, some days he works first, second, and third shifts, and he uses everyone else's money to gamble with, okay, **I was told he would probably still be in a certain relationship if he wasn't gambling away all that money**….[6]

10.     Of course, her followers immediately understood that, once again, Debtor was making reference to Ms. Almánzar's marriage with Offset and issues that led to their separation.

**B.      A Proponent of a Consensual Negotiated Plan Clause Cannot Claim it is Ambiguous**

11.     Ambiguity doctrine exists to protect parties from being held in contempt for conduct they could not reasonably have understood was prohibited. It has no application here. Offset was specifically discussed by name during the negotiation of the Non-Disparagement Clause before Plan confirmation. The Motion establishes this. The third violation notice quotes it. Debtor's Response does not deny it. A party who negotiated a specific prohibition cannot claim she did not understand that it prohibited that specific conduct. The Non-Disparagement

---

friend, who has accused him of sexual assault, along with a viral image showing Diggs on a yacht in a moment that appeared to involve drugs."

[6] https://www.facebook.com/unwinewithtashak/videos/copy-of-jennifer-template/983196354136459/ (transcribed by undersigned; emphasis added).

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

Clause is as unambiguous as it could possibly be: "no content related to Ms. Almánzar and/or her family, whether explicitly or implicitly."

12.     Moreover, the Supreme Court was explicit in *United States v. Rylander*, 460 U.S. 752 (1983): "It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." [7] What Debtor asks this Court to do in her Response is precisely that - relitigate what the Non-Disparagement Clause means, conducted through the back door of a contempt defense. The time to contest the scope of the order was before or at confirmation. Debtor accepted the terms. She is bound by them.

### C.     The Confirmation Hearing Record Forecloses the Ambiguity Argument

13.     At the February 24, 2025 confirmation hearing, Ms. Almánzar's counsel stated on the record, before this Court, that "[t]here was quite a bit of negotiation that went on, certainly late, but we got where we needed to get with the non-disparagement clause, which was really critical considering the nature of the defamation judgment that had occurred."[8]

14.     The Court confirmed the Plan with that representation on the record. A provision that was "really critical," heavily negotiated, and specifically addressed to this Court before confirmation is not ambiguous. It is the central, defining condition of the agreement. Debtor's attempt to claim confusion about its scope fourteen months later, after over 25 documented violations, is not credible.

---

[7] *Id*. at 756.
[8] Hr'g Tr. Feb. 24, 2025: 7:23 through 8:2.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

### III. THE CURE PROVISION OF PARAGRAPH 14(b) IS INAPPLICABLE TO THE VIOLATIONS AT ISSUE AND DOES NOT CONSTITUTE A GENERAL LICENSE TO POST PROHIBITED CONTENT

15.    The Response's most fundamental legal error is its treatment of the Paragraph 14(b) cure provision as a general compliance mechanism that somehow validates Debtor's post-and-delete cycle as good faith performance. This misreads the plain text of the provision in a manner that no reasonable construction supports.

16.    Paragraph 14(b) provides a cure mechanism applicable only when a prohibited comment is made "with respect to an *Unidentified Almánzar Party*" – defined as "a family member of Ms. Almánzar not known to Debtor and/or the general public" to be related to Ms. Almánzar. In that narrow and specific circumstance, and only that circumstance concerning an unknown family member, Debtor has 48 hours from receipt of notice to remove the content.

17.    Not one of the violations catalogued in the Motion and Supplement involves an Unidentified Almánzar Party. Offset is Ms. Almánzar's husband. He was specifically discussed by name during negotiation of the clause before confirmation. Stefon Diggs was Ms. Almánzar's publicly reported romantic partner and is the father of one of her children. Ms. Almánzar herself requires no identification. The cure provision, by its plain terms, has zero application to any of the conduct at issue. Debtor never engages with this textual reality in the Response; rather, Debtor describes Paragraph 14(b) as a general enforcement mechanism – which it is not – and builds her entire knowingly false good faith narrative on a provision that does not cover the violations she is defending.

18.    The Motion's characterization of Debtor's conduct as a "business model" is not rhetorical hyperbole. It is an accurate description of what the record shows: she posts prohibited content about Ms. Almánzar and her family, generates tens of thousands of views and

9

advertising revenue, waits to see if a violation notice arrives, removes the post after the damage is irreversible, and repeats. The Eleventh Circuit addressed exactly this pattern in *FTC v. Leshin* (ironically cited by Debtor in her Response) holding that retransfer of contracts after the violation "did not cure" it because "the violation had already occurred." 618 F.3d at 1235. The violation is complete upon publication. The sanctions attach at that moment. Post-publication removal is not a cure; it is the final step in a profitable cycle for Debtor.

19.     Furthermore, in *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1517-1518 (11th Cir. 1990), the Eleventh Circuit held that defendants who "deliberately sought a name that would be close to [the plaintiff's] name, yet not infringe" – testing the boundaries of a court order rather than honoring its spirit – could not invoke a good faith compliance defense. Debtor's thinly coded references, crowd-sourced audience identification, and tactical use of obvious nicknames and contextual cues are the precise equivalent of testing how close to the line she can get without technically naming Ms. Almánzar. *Howard Johnson* supports the proposition that this approach is itself contemptuous.

## IV.     THE GOOD FAITH COMPLIANCE DEFENSE FAILS UNDER CONTROLLING ELEVENTH CIRCUIT AUTHORITY

20.     Debtor's argument in Section IV of the Response, that Debtor's prompt removal of content upon notice demonstrates good faith compliance sufficient to defeat a contempt finding, is directly foreclosed by the controlling case Debtor cites for her sanctions standard.

21.     In *FTC v. Leshin*, 618 F.3d 1221, 1232 - 1233 (11th Cir. 2010), Debtor's own primary citation, the Eleventh Circuit stated with unmistakable clarity: "The Supreme Court has made clear that the absence of willfulness is not a defense to a charge of civil contempt. . . . We do not focus on the subjective beliefs or intent of the alleged contemners in complying with the order, **but whether in fact their conduct complied with the order at issue**." (Internal

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

quotations omitted.) The *Leshin* defendants made precisely the argument Debtor advances in her Response: that her good faith effort at compliance, and the absence of demonstrated consumer harm from individual technical violations, should defeat contempt. The Eleventh Circuit soundly rejected this argument. "substantial, diligent, or good faith efforts are not enough; the only issue is compliance." *Id.*

22.   This guiding principle runs through every civil contempt case in this Circuit. In *Howard Johnson*, the Eleventh Circuit affirmed contempt where the defendants "engaged in the process of compliance slowly and grudgingly, prompting three motions for civil contempt." 892 F.2d at 1518.

23.   In this case, there have been three violation notices, and three instances of reactive removal. A pattern of testing the line rather than honoring the obligation. That is this case, described in the Eleventh Circuit's own language.

24.   Debtor's additional citations for the good faith proposition fare no better. *Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985), contains no discussion of good faith compliance as a defense to contempt. It is a class action case addressing the mandate rule and class counsel disqualification. Its only reference to contempt is the court's instruction that lead counsel be held in contempt if they failed to restore settlement funds - a posture supporting enforcement, not leniency. Similarly, *In re Skinner*, 917 F.2d 444 (10th Cir. 1990), contains no such holding as what Debtor proposes. It addresses the statutory and constitutional authority of bankruptcy courts to exercise civil contempt power under § 105(a). Neither case supports the proposition for which it is cited. The fact that Debtor's counsel repeatedly cited propositions of law falsely attributed to existing cases demonstrates a complete and utter lack of candor and significantly prejudices Ms. Almánzar by forcing her, at great and unnecessary expense, to

11

respond to a brief with such false authority. The Court should not only sanction Debtor and her counsel, as well as award attorneys fees to Ms. Almánzar.

25.     Beyond the case law, the record itself defeats the good faith narrative. Debtor has publicly made clear, on multiple platforms, that she resents the Non-Disparagement Clause, agreed to it at the time only because she "had to," and intends to continue the prohibited conduct. Indeed, as recently as April 21, 2026, as noted in the Supplement to the Motion, Debtor falsely stated to her viewers that she is not bound by an NDA at all. She has described her non-compliant "compliance" as coerced rather than genuine. A debtor who genuinely intended to honor a court-confirmed obligation does not publicly refute its existence, continue to violate it or announce her intent to even further escalate her harassment of Ms. Almánzar the moment the obligation expires. These are the statements of dishonest and deceitful debtor who only agreed to the clause as a tactical maneuver to preserve her bankruptcy case, not because she ever had any genuine intention of complying with it.

## V.    THE PRIOR RESTRAINT ARGUEMENTS FAIL UNDER DEBTOR'S OWN CITED AUTHORITY, AND THE COMMENTARY ON OFFSET CONSTITUTES PROHIBITED INDIRECT DISPARAGEMENT UNDER PARAGRAPH 14(a)

### A.    The Prospective Sanction Framework is Not a Prior Restraint

26.     The most precise refutation of Debtor's prior restraint argument comes from one of her own citations. In *Alexander v. United States*, 509 U.S. 544, 550 (1993), the Supreme Court defined a prior restraint as "administrative and judicial orders forbidding certain communications **when issued in advance of the time that such communications are to occur.**" (Emphasis added.) The Court then held that financial consequences imposed after speech has occurred are subsequent punishments – not prior restraints – even where those consequences are severe enough to affect the speaker's future conduct. *Id*. at 548-550.

12

27.     The prospective per-publication sanctions Ms. Almánzar seeks attach *after* each post is published – not before. Debtor alone controls what she chooses to post, at any time, without seeking prior approval from anyone. If she posts content that violates the Plan and Confirmation Order, she should bear the financial consequence of that decision. That is not censorship. It is deterrence, and it is precisely what civil contempt sanctions are designed to accomplish. Debtor's own citation says so.

28.     Debtor also cites *Near v. Minnesota*, 283 U.S. 697 (1931), the foundational prior restraint case. But the *Near* Court itself drew the critical distinction that disposes of her argument. The Court stated: "The statute is not aimed at the redress of individual or private wrongs. *Remedies for libel remain available and unaffected.*" *Id.* at 709 (emphasis added). The Court further stated it was not addressing "questions as to the extent of authority to prevent publications in order to *protect private rights* according to the principles governing the exercise of the jurisdiction of courts of equity." *Id.* at 716. *Near* expressly reserved the private rights enforcement context – which is exactly this case. The enforcement of a consensually negotiated, court-confirmed, non-disparagement clause is not government censorship of the press. It is a court enforcing a contract bearing its imprimatur.

**B.      Commentary on Offset Constitutes Prohibited Implicit Disparagement**

29.     Debtor argues that her sixteen posts about Offset following the April 2026 shooting constitute legitimate news coverage of an "independent public figure" and that treating such coverage as prohibited would create a "blanket gag order" on an entire category of celebrity news. This argument is precisely backwards.

30.     Paragraph 14(a) does not merely prohibit direct references to Ms. Almánzar. It prohibits **any content related to Ms. Almánzar and/or her family, whether explicitly or**

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

**implicitly.** The word "implicitly" was drafted to address exactly the methodology Debtor has employed throughout this case. She does not need to name Ms. Almánzar. Her audience names her for her. Every time Debtor posts about Offset – his shooting, his personal life and challenges, his romantic activities, his domestic arrangements – Debtor's followers flood the comments with references to Ms. Almánzar, the defamation judgment, and the bankruptcy proceedings. The Motion documents this. Debtor does not even try to deny it.

31.    Debtor is not a dispassionate gossip columnist (and she is certainly no journalist) covering a Grammy Award-winning artist or other celebrities associated with her. Debtor is the person held liable for nearly $4 million in defamation damages arising from a years-long campaign against Ms. Almánzar and that judgment included punitive damages against her individually as well as against her entity given the harm and malice. Debtor's audience understands every post about Offset or Stefon Diggs through that lens – and Debtor knows it, which is why she posts about them. She uses her words as the weapon and directs the aim, and her followers eat it up and repost the prohibited statements every single time. The indirect disparagement is not incidental to the content; it is the entire purpose of it.

32.    Debtor's "no limiting principle" argument also fails. The limiting principle is the text of Paragraph 14(a): content related to Ms. Almánzar and her family, whether explicitly or implicitly referenced. A broadcaster who covers Offset's shooting without any reference - coded or otherwise - to Ms. Almánzar, the judgment, or the bankruptcy has nothing to fear from this clause. Debtor is not a benign and disinterested broadcaster, and the last eight years of documented conduct confirm it.

14

## VI.    THE FEE AWARD OBJECTION IS PROCEDURALLY PREMATURE

33.    Debtor argues that Ms. Almánzar's fee request is deficient for lack of itemization, billing records, and a lodestar analysis, citing *Norman v. Housing Authority of Montgomery*, 836 F.2d 1292 (11th Cir. 1988), and *In re Rimsat, Ltd.*, 212 F.3d 1039 (7th Cir. 2000). This objection misunderstands where in the contempt proceeding this Motion sits.

34.    The Motion does not ask this Court to award a specific dollar amount at this hearing although Ms. Almánzar respectfully submits that is should be a significant one. Rather, it asks the Court to find that willful violations of the Confirmation Order occurred and to establish that attorneys' fees are warranted as a consequence of those violations. The quantum of those fees – the billing records, the lodestar analysis, the nexus between specific violations and specific time entries – belongs at an evidentiary hearing that has not yet occurred and has not yet been ordered.

35.    Civil contempt proceedings routinely bifurcate liability from sanctions quantification. The first hearing establishes whether contempt occurred and whether fees are in principle appropriate. The second hearing - with evidence, billing records, and opportunity for cross-examination - establishes the amount. Debtor's citations address the requirements for a final fee award. They have nothing to say about a motion requesting that an evidentiary hearing be scheduled, and Ms. Almánzar requests such an evidentiary hearing to establish the cost of Debtor's contumacious behavior.

## VII.    PROSPECTIVE SANCTIONS ARE APPROPRIATE, COMPENSATORY AND SUBJECT TO JUDICIAL OVERSIGHT

36.    Debtor argues that the prospective per-publication sanction framework Ms. Almánzar requests would create an unconstitutional regime of automatic penalties triggered by

15

Ms. Almánzar's unilateral determination of what constitutes a violation. This characterization is incorrect.

37.     Ms. Almánzar has never suggested, and the Motion does not request, that she be empowered to impose financial penalties without judicial review. When a future violation occurs, Ms. Almánzar will bring it to this Court's attention and seek appropriate relief through the established enforcement mechanism. What the Motion requests is that this Court establish, as a matter of deterrence, that future violations will result in significant monetary consequences - consequences whose amount and structure this Court will determine at the appropriate time. Ms. Almánzar simply argues that any such financial penalties be significant – otherwise, they will serve no deterrent effect.[9]

38.     The purpose of this framework is straightforward: to change Debtor's pre-publication calculus. The current economics of the post-and-delete cycle after written notice favor violation. A court-established prospective sanction changes that calculation by requiring Debtor, before posting about Ms. Almánzar or her family, to weigh the anticipated revenue against the potential cost of a monetary sanction. That is deterrence – precisely what civil contempt sanctions are designed to accomplish under *Leshin* and *Howard Johnson*. And it is most certainly not a prior restraint, as demonstrated in Section V above.

39.     The Eleventh Circuit in *Howard Johnson* approved an award of profits on an unjust enrichment theory where the contemnor "injured [the plaintiff] by imitating its trademark without compensation and enriched themselves by tapping the reputation and good will" of the plaintiff. *Howard Johnnson*, 892 F.2d at 1521. Debtor's business model is precisely this: she

---

[9] As shown by Debtor's conduct immediately after the entry of the Defamation Judgment and throughout the course of this bankruptcy case, even a nearly $4 million judgment has apparently not deterred Debtor from her obsession to attack Ms. Almánzar.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

monetizes Ms. Almánzar's name and notoriety through prohibited posts, collects the advertising revenue, and then removes the content after challenge – and *only* after challenge. A prospective sanction calibrated to the per-post revenue benefit derived from each violation is not punitive - it is compensatory, and it is supported by controlling and well-established Eleventh Circuit authority.

## VIII.    PARAGRAPH 43 OF THE RESPONSE CONTAINS MATERIAL FACTUAL MISREPRESENTATIONS THAT THE COURT SHOULD NOT ACCEPT

40.    Paragraph 43 of the Response makes four factual assertions that Ms. Almánzar directly disputes, and the Court should not accept them as established without examination.

41.    *First*, Debtor falsely states that "Debtor has remained current on all Plan payments." This is incorrect. Debtor has on at least two occasions made plan payments only after being notified by Ms. Almánzar's counsel of nonreceipt, and the docket reflects this. As of April 22, 2026, no quarterly Plan payment for the quarter ending March 31, 2026, had been received by Ms. Almánzar, and no post-confirmation quarterly operating report for that quarter had been filed with this Court, despite both being due under Paragraphs 10 and 12 of the Confirmation Order by April 21, 2026. Debtor belatedly made the overdue payment six days after the deadline had passed, and only after the undersigned brought it Debtor's counsel's attention. Thus, it is simply inaccurate that Debtor was current on either Plan payments or reporting requirements. Moreover, with respect to the Quarterly Report, up until about an hour before the filing of this Reply, bank statements were still missing. Additionally and importantly, no attempt whatsoever has been made by Debtor to comply with the true-up provisions of the Plan and Confirmation Order, and those matters will be addressed with the Court after Ms. Almánzar's forensic analysis is complete upon receipt of documents requested from Debtor and third parties.

17

42.     *Second*, Debtor characterizes removal of content upon notice as evidence of good faith compliance – "precisely what the cure provision was designed to accomplish." As demonstrated in Section III above, removal upon notice is not a cure under the applicable provision. As detailed at length above, **the cure provision applies only to Unidentified Almánzar Parties**. It has no application to the violations at issue. More fundamentally, removal after publication does not undo the violation. The views are collected. The advertising revenue is generated. The screenshots and reposts have proliferated beyond recall. The harm is multiplied and cannot be mitigated. Under *Leshin*, the violation is complete upon publication. The post-publication deletion is not remediation – it is the final step in a profitable and deliberate cycle.

43.     *Third*, Debtor states that she "engaged in good faith discussions through counsel regarding the scope of the Non-Disparagement Clause." The record does not support this characterization. For months, Ms. Almánzar's counsel sent formal violation notices and demands to which there was no substantive response other than the dilatory removal of the offending publication. Good faith engagement about a genuinely uncertain provision looks like dialogue, clarification, and an attempt to understand the scope of one's obligations. Silence followed by the next violation is not good faith engagement. It is indifference. And as noted repeatedly herein, the provision is clear, unambiguous, and that can be no sincere uncertainty about what it prohibits. Debtor knows exactly what is proscribed and why. She just doesn't care.

44.     *Fourth*, Debtor argues that the vast majority of her content has not been flagged, and that this pattern of "largely compliant" conduct should weigh against contempt. This argument is a red herring. Ms. Almánzar is not the content regulator of Debtor's social media operation. She has no interest in, and has made no complaint about, the majority of Debtor's

18

posts. The Non-Disparagement Clause covers a specific, defined category of prohibited conduct. The fact that Debtor posts extensively about other subjects without generating complaints establishes nothing about whether she violated the clause when she repeatedly posts about Ms. Almánzar or her family members in violation of the Plan and Confirmation Order. The scope of this Motion is defined by Paragraph 14. Everything outside that scope is irrelevant to the proceedings before this Court.

## IX.    PARAGRAPH 41 OF THE RESPONSE IS AN IMPROPER REQUEST FOR JUDICIAL REFORMATION OF CONFIRMED PLAN TERMS

45.    Paragraph 41 of the Response asks this Court to enter an order limiting any prospective guidance to statements "demonstrably about Ms. Almánzar, derogatory or defamatory in nature, and not otherwise protected expression on matters of public concern." This is not a request for enforcement clarification. It is a request for an entire judicial reformation of the Non-Disparagement Clause – an attempt to add limitations, qualifications, and carve-outs that the parties did not negotiate and that do not appear anywhere in the unambiguous and consensually negotiated and agreed upon Plan and Confirmation Order.

46.    Courts do not rewrite contracts because one party finds compliance inconvenient or economically painful. A confirmed plan binds the parties according to its terms under 11 U.S.C. § 1141(a).

47.    The Supreme Court was explicit in *Rylander*: a contempt proceeding "does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed." *Rylander*, 460 U.S. at 756-57. Debtor's proposal in paragraph 41 is a direct attempt to do precisely that – to relitigate what the Non-Disparagement Clause should mean through the back door of a contempt response. The Court confirmed the Plan with Paragraph 14 as written. It is not available for renegotiation now.

19

48.     Moreover, Debtor's conduct throughout the life of this Plan demonstrates that the reformation she seeks was never part of the bargain. She accepted the Non-Disparagement Clause under circumstances where this Court told her the alternative was case dismissal if Ms. Almánzar proved even a fraction of the allegations supporting the Motion to Dismiss. Debtor then publicly announced her resentment of the clause and her intent to continue prohibited conduct. The pattern of systematic violations, public admissions, and monetized post-and-delete cycles reveals a debtor who treats the clause as an obstacle to manage rather than an obligation to honor. Courts of equity do not rewrite agreements to accommodate bad faith performance.

X.     **DEBTOR'S RESPONSE SUBMITS A FABRICATED OR WHAT APPEARS TO BE A "HALLUCINATED" CASE CITATION AND SEVERAL CITATIONS THAT DO NOT EVEN REMOTELY SUPPORT THE PROPOSITIONS ASSERTED, WARRANTING SANCTIONS**

A.     ***Doe v. Gonzalez*, 723 F.3d 1237 (11th Cir. 2013) Does Not Exist**

49.     Paragraph 33 of the Response cites *Doe v. Gonzalez*, 723 F.3d 1237 (11th Cir. 2013), for the proposition that "injunctions restricting speech [are] construed narrowly." This case does not exist. Counsel for Ms. Almánzar has conducted an exhaustive search of published and unpublished Eleventh Circuit opinions through Westlaw, the official Eleventh Circuit database, and available electronic research tools. No decision captioned *Doe v. Gonzalez* exists at that citation or under any variation of that case name in the Eleventh Circuit reporter. The case was submitted to this Court as existing legal authority. It does not exist.[10]

50.     This Court is being asked to deny a motion to enforce its own Confirmation Order based in part on legal authority that was entirely fabricated as well as on multiple

---

[10] Undersigned did find a Supreme Court case captioned *Doe v. Gonzalez*, 546 U.S. 1301 (2005), which addressed a provision of the USA Patriot Act prohibiting librarians from disclosing that the FBI had requested information about a patron in a national security letter. The bureau had demanded details about a visitor's electronic communications. The Second Circuit stayed an injunction while granting expedited review of the district court's ruling that the provision was unconstitutional. Doe challenged the provision as an unlawful prior restraint. Even if this were the case Debtor intended to cite, it certainly does not stand for the proposition in Debtor's Response.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

propositions of law for which existing cases do not stand, or attributed quotes that do not exist is cited cases. The implications are serious on multiple levels.

51.    First, this Court has an institutional interest in the accuracy of legal authority submitted to it. Non-existent hallucinated authority cannot be distinguished, verified, or weighed. It contaminates the record. It impedes the administration of justice in numerous ways. It not only prejudices and forces Ms. Almánzar to incur unnecessary expense, but also squanders the limited resources of this Court and delays resolution of this and other cases pending before the Court.

52.    Second, counsel has an absolute, non-waivable obligation of candor to the tribunal. Rule 4-3.3(a)(1) of the Florida Rules of Professional Conduct prohibits a lawyer from making false statements of law to a tribunal. A significant sanction is appropriate as Debtor's counsel should know that submitting a brief with fabricated citations is a clear breach of an attorney's duties of professionalism, truthfulness, and candor to the Court. When an attorney signs the filed brief he is certifying that the citations are accurate and that the cases are not entirely contrived from thin air like the hallucinated one cited in Debtor's response not to mention that it does not contain inaccurate descriptions of propositions the real cases stand for. Suffice it to say, these are inexcusable transgressions and merit disciplinary proceedings.

53.    Third, Bankruptcy Rule 9011(b)(2) requires that all legal contentions be "warranted by existing law or by a nonfrivolous argument to extend, modify or reverse existing law, or to establish new law." A citation to a case that does not exist is not warranted by existing law – it is a misrepresentation to the tribunal and also a blatant failure to follow the rules of procedure, not to mention the professional rules of conduct. Rule 9011(c) authorizes this Court to impose appropriate sanctions, including an order to pay the reasonable expenses

21

incurred by Ms. Almánzar as a result of the violation. This Court should award significant sanctions to prevent further abuse of the judicial process and make it clear that false citations will not be tolerated in this jurisdiction. Using fake and hallucinated cases casts a shadow on invalidity on the judicial process and causes the public to question its commitment to truth and justice, which is particularly odious. Lawyers who fail to check the accuracy of the information in their briefs should be held accountable. This egregious conduct cannot be tolerated in any judicial system and especially not one whose precious resources are already extremely strained.

54.     Ms. Almánzar does not presume to know whether this citation was generated through AI assistance without adequate verification, copied from a secondary source, or introduced through some other mechanism. What she does know - and what this Court should know - is that the citation was submitted without adequate verification and does not exist. The professional responsibility rules do not require proof of intent. They require accuracy, and accuracy requires verification before submission to a federal court. And parties should not have to be subjected to the stress and uncertainty of litigation when briefs contain fictitious cases that require them and this Court to waste time sorting through fake and/or misleading citations.

55.     Ms. Almánzar respectfully requests that the Court: (1) disregard the fabricated citation in its entirety (and as detailed below, disregard the multiple misleading proposition and fake quotes from real cases); (2) note on the record that the cited authority does not exist; and (3) award sanctions under Bankruptcy Rule 9011, including an award of the reasonable expenses incurred by Ms. Almánzar in researching and exposing the nonexistent and apparently hallucinated citation.

22

**B.     Several Additional Citations do not Support the Propositions for Which They are Asserted**

56.     The entirely fabricated citation is the most serious example of a pattern in the Response of citing cases for propositions they do not contain, or that affirmatively contradict Debtor's arguments. The Court should disregard the Response entirely, or evaluate the Response with this in mind.

57.     *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000), is cited for the quoted proposition that "[a]n order is not enforceable through contempt if it fails to be sufficiently clear and definite." **That quoted language does not appear in *McGregor*.** The case involves whether a non-participating spouse was covered by an order directed at active business participants – a fundamentally different question from whether a clearly worded non-disparagement clause covers the conduct at issue. More significantly, *McGregor* affirmed broad district court discretion in fashioning compensatory contempt sanctions, including disgorgement of profits – directly supporting Ms. Almánzar's requested relief.

58.     *Alexander v. United States*, 509 U.S. 544 (1993), is cited in support of Debtor's prior restraint argument for the proposition that 'court orders that actually forbid speech activities are classic examples of prior restraints.' The Supreme Court in *Alexander* used that language to explain what a prior restraint *is* – and then held that post-conviction financial consequences are *not* prior restraints because they impose "no legal impediment" on future expression. Debtor's own citation holds the opposite of what she argues.

59.     *Law v. Siegel*, 571 U.S. 415 (2014), is cited for the proposition that § 105(a) powers may not contravene specific provisions of the Bankruptcy Code. That case involved a court using § 105(a) to override an express statutory exemption in § 522 that made exempt property not liable for administrative expenses. There is no analogous Code provision here. The

23

Supreme Court in *Law v. Siegel* expressly stated that "ample authority remains to address debtor misconduct," specifically including "sanctions for bad-faith litigation conduct under . . . § 105(a), or a bankruptcy court's inherent powers" – precisely the relief requested here.

60.      *Piambino v. Bailey* and *In re Skinner* are both cited for the proposition that courts decline to impose contempt sanctions where the respondent demonstrated good faith efforts to comply. Neither case contains this holding. *Piambino* is a class action case about the mandate rule and class counsel disqualification – its only contempt reference is an instruction that counsel be held in contempt for failing to restore funds to the court registry. *In re Skinner* addresses the statutory and constitutional authority of bankruptcy courts to impose civil contempt sanctions – and confirms that authority exists under § 105(a).

## **CONCLUSION**

61.      The record before this Court is not complicated. Debtor willingly and knowingly accepted the Non-Disparagement Clause to preserve her bankruptcy case when this Court told her counsel the case was over if the undersigned proved even a fraction of his allegations. She received the benefit of that bargain – a stay of enforcement of a nearly $4 million nondischargeable judgment. She then proceeded to habitually violate the clause she negotiated, systematically and publicly, more than twenty-five documented times, across multiple platforms, while generating advertising revenue from each violation, and publicly announcing her intent to continue the prohibited conduct.

62.      The Response does not dispute the existence of these posts. It does not deny that Debtor made the statements attributed to her in the Morning Hustle interview, the X Spaces audio, or the TikTok livestream. It argues instead that the clause means something different from what it plainly and unambiguously says on its face, and then, equally ingenuously, that

24

removal-upon-demand constitutes compliance, and that First Amendment doctrines developed to protect the press from government censorship should shield a private party acting in bad faith from the consequences of breaching a voluntary contractual obligation that they agreed to.

63.    These arguments find no support in the plain text of Paragraph 14, the negotiating history of the clause, the hearing record, or the controlling decisions of the Eleventh Circuit. They find substantial contradiction in the very cases Debtor cites; and worse, Debtor resorts to citations to either nonexistent or hallucinated cases, non-existent quotations in actual cases, or cases that do not remotely stand for the propositions asserted.

WHEREFORE, Ms. Almánzar respectfully requests that the Court: (1) find that Debtor has materially, knowingly, and willfully violated the Non-Disparagement Clause of the Confirmation Order on no fewer than twenty-five documented occasions asserted in the Motion and the additional violations in the Supplement; (2) enter an order requiring Debtor to immediately delete any and all prohibited content on her social media platforms and cease and desist from all direct, indirect, and implicitly coded references to Ms. Almánzar and her family members; (3) schedule an evidentiary hearing at which Ms. Almánzar will present billing records and evidence in support of an award of attorney's fees and costs incurred in monitoring, documenting, and enforcing the Non-Disparagement Clause from the date of the Confirmation Order through the conclusion of this proceeding and on a continuing basis; (4) establish a prospective monetary sanction for each future violation, with the amount to be determined at the evidentiary hearing, attaching upon publication and not subject to mitigation by subsequent removal; (5) award Rule 9011 sanctions, including attorneys' fees to Ms. Almánzar in connection with the submission of the fabricated citation to *Doe v. Gonzalez*, 723 F.3d 1237 (11th Cir. 2013) and fake quotation in *McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000);

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

and (6) grant such other and further relief as this Court deems just and proper, including, if violations continue, the remedies available under Paragraph 14(c) of the Confirmation Order.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on May 4, 2026, via the Court's Notice of Electronic Filing upon Registered Users set forth on the Electronic Mail Notice List and served via Regular U.S. Mail upon the parties listed on the Manual Notice List.

Respectfully submitted,

By: */s/James C. Moon*
James C. Moon, Esquire
Florida Bar No. 938211
jmoon@melandbudwick.com
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221

*Attorneys for Belcalis Marlenis Almánzar*

26

**Electronic Mail Notice List**
The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Karen Ann Green**    ANHSOrlans@InfoEx.com
- **Brett D Lieberman**    brett@elrolaw.com, eservice@elrolaw.com;tisha@elbizlaw.com;virginia@elbizlaw.com;denissis@elbizlaw.com
- **James C. Moon**    jmoon@melandbudwick.com, ltannenbaum@melandbudwick.com;mrbnefs@yahoo.com;jmoon@ecf.courtdrive.com;ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com
- **Martin P Ochs**    martin.p.ochs@usdoj.gov
- **Office of the US Trustee**    USTPRegion21.MM.ECF@usdoj.gov
- **Raychelle A Tasher**    Raychelle.Tasher@usdoj.gov, bridgett.moore@usdoj.gov;Shannon.Patterson@usdoj.gov
- **Chad T Van Horn**    Chad@cvhlawgroup.com, chad@ecf.inforuptcy.com,chapter7@cvhlawgroup.com,broward@cvhlawgroup.com,chapter11@cvhlawgroup.com,miami@cvhlawgroup.com,cmecf@cvhlawgroup.com,VanHorn.ChadB104447@notify.bestcase.com,ECF@cvhlawgroup.com,van-horn-law
- **Maria Yip**    trustee@yipcpa.com, mmy@trustesolutions.net;cmmy11@trustesolutions.net;F012@ecfcbis.com

**Manual Notice List**

The following is the list of **parties** who are **not** on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

> **Ally Bank, c/o AIS Portfolio Services, LLC**
> 4515 N Santa Fe Ave. Dept. APS
> Oklahoma City, OK 73118
>
> **American Express National Bank**
> c/o Becket and Lee LLP
> PO Box 3001
> Malvern, PA 19355-0701
>
> **Discover Bank**
> PO Box 3025
> New Albany, OH 43054